Roy JOHNSON, Plaintiff–Appellant,

v.

CITY OF FORT WAYNE, INDIANA, Fort Wayne Fire Department of City of Fort Wayne, Indiana, Paul W. Helmke, as Mayor of the City of Fort Wayne, Indiana, et al., Defendants–Appellees.

Nos. 95–1950, 95–2655.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1995.

Decided July 31, 1996.

**928**

Jack C. Brown, Indianapolis, IN, John O. Moss (argued), Moss & Associates, Indianap-olis, IN, for Plaintiff–Appellant in No. 95–1950.

J. Timothy McCaulay (argued), Trina G. Gould, Helmke, Beams, Boyer & Wagner, Fort Wayne, IN, for Defendants–Appellees in No. 95–1950.

John O. Moss, argued, Moss & Associates, Indianapolis, IN, for John O. Moss in No. 95-2655.

Jack C. Brown, Indianapolis, IN, for Jack C. Brown in No. 95-2655.

Before FLAUM, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, *Circuit Judge.*

Following his demotion, Roy Johnson, an African–American firefighter employed by the Fort Wayne Fire Department, commenced this action against the City of Fort Wayne and various municipal officials. Citing his demotion and various other employment actions, the complaint alleges, in ten counts, that the defendants violated his rights under Title VII, 42 U.S.C. § 1981, the First Amendment, the substantive and procedural components of the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. The district court granted the City's motion for summary judgment and assessed attorneys' fees against Mr. Johnson and his attorneys, and Mr. Johnson appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court in part, reverse in part and vacate in part.

## I

### BACKGROUND

Roy Johnson, an African–American, has been employed by the Fort Wayne Fire Department ("the Department") since 1975. Mr. Johnson had advanced to the rank of Lieutenant when, on January 1, 1988, he was appointed by Fort Wayne Mayor Paul Helmke to the position of Assistant Fire Chief and assigned the Department's labor relations responsibilities. At the time of Mr. Johnson's appointment to Assistant Chief, the Department's upper level command was comprised of six positions: Fire Chief, Deputy Fire Chief, Assistant Fire Chief (Training), Assistant Chief (Administration), Assis-

tant Chief (Shop), and Assistant Chief (Labor Relations).

Mr. Johnson's difficulties began in January 1992 when Mayor Helmke appointed Payne Brown, who is also an African–American, to the position of Safety Director. The Safety Director acts as a liaison between the Mayor's Office and the Police and Fire Departments. Shortly after appointing Payne Brown to this position, Mayor Helmke ordered his new Safety Director to review the Fire Department's upper level management structure and to determine whether a fiscal savings could be realized through a reorganization. Brown did not complete the review and present a reorganization plan to Mayor Helmke until April 1993. In the interim, however, Mr. Johnson began to experience difficulties with the Department.

In late 1992 or early 1993, Mr. Johnson and Payne Brown had a disagreement concerning the implementation of a random drug-testing policy for the Department. Mr. Johnson opposed implementing such a policy on the ground that random drug testing would violate the firefighters' collective bargaining agreement. Safety Director Brown, who favored random drug testing, considered Mr. Johnson's lack of support to be insubordination. At or around the same time, Mr. Johnson met with the City's EEOC officer to discuss racial discrimination that he claimed to have experienced in the Department and, through his attorney, wrote to Payne Brown on the same subject. Brown responded with a one-sentence letter telling Mr. Johnson to "[g]o ahead and sue." R.30, Ex. CC.

In February 1993, the Common Council of the City of Fort Wayne enacted City Ordinance G–06–93, which reestablished the Mayor's power to remove persons in "upper level policymaking positions" without cause.

On March 24, 1993, a Fort Wayne police captain spotted Mr. Johnson's Fire Department vehicle parked for an extended period of time at the Skyway Tavern in Fort Wayne. Considering it inappropriate for the vehicle to be parked there, the police captain notified Steve Hinton, the Fire Department's "on call" duty chief. Hinton indicated to the police captain that, if Mr. Johnson attempted to drive the vehicle from the Tavern, the police "should probably stop [Mr. Johnson] and . . . see if he had been drinking." R.30, Deposition of Russell P. York, at 18. City Police Chief Neil Moore notified Payne Brown of the situation, and Brown dispatched a firefighter to the scene to retrieve the City vehicle if Johnson were unfit to drive. Brown did not instruct any member of the Police Department how to proceed. Acting on a suggestion made by Police Chief Moore, police officers at the scene made a discreet inquiry to Mr. Johnson about his sobriety level. Mr. Johnson requested and was administered a breathalyser test, which indicated that he had not consumed a detectable quantity of alcohol.

In April 1993, Safety Director Brown completed his study of the Fire Department's management structure and submitted a reorganization plan. The plan called for the elimination of five positions: Deputy Chief, Assistant Chief (Labor Relations), Assistant Chief (Administration), and two platoon captain positions. The plan also added an Assistant Fire Chief (Combat) position and a civilian position to handle residual duties not absorbed by other members of the Department.

Shortly after being advised by Payne Brown that his position was being eliminated, Mr. Johnson filed a complaint with the EEOC alleging that the Skyway Tavern incident and other exclusionary practices instituted by Brown amounted to harassment on account of his race. Consistent with the reorganization plan, Mr. Johnson was demoted to his prior rank of Lieutenant effective April 30, 1993. Also in April, Fire Chief Robert Barnes agreed, at the request of Mayor Helmke and Safety Director Brown, to resign his position and to return to his former rank of Captain effective June 1, 1993. On May 20, 1993, Fire Chief Barnes received permission to extend the effective date of his resignation to July 6, 1993 and to take vacation time before leaving office. During his vacation, Barnes was permitted to use the Fire Chief's car and was paid at the Fire Chief's grade. Steve Hinton was appointed as the new Fire Chief.

Mr. Johnson took vacation leave from May 3 to July 27. During this vacation, he was paid at Lieutenant grade and was denied the use of a Department vehicle. On May 10, 1993, Mr. Johnson filed a second complaint with the EEOC, alleging that he had been demoted on account of his race and in retaliation for his prior complaints. Upon returning from his vacation, Mr. Johnson applied for the newly created Assistant Chief (Combat) position. Chief Hinton did not interview Mr. Johnson for the position and selected Steve Adams, a white firefighter, to fill the post.

Beginning in August 1993, Mr. Johnson took sick leave for job-related stress; in October, Chief Hinton ordered Mr. Johnson to be evaluated by the City doctor. Mr. Johnson evidently did not comply with this directive; he was brought before a disciplinary committee in December for violating sick leave and for failing to comply with Chief Hinton's order. The charges were dropped when Mr. Johnson signed the necessary release forms. On February 11, 1994, Mr. Johnson filed a complaint with the EEOC alleging that the disciplinary proceedings and the Chief's order amounted to racial harassment and retaliation for his prior complaints. On March 15, 1994, Mr. Johnson filed a complaint with the EEOC alleging that he was not interviewed for the Assistant Chief (Combat) position on account of his race and in retaliation for his prior complaints.

In March 1994, Chief Hinton ordered Mr. Johnson to stay away from fire stations and fire scenes as long as he remained on sick leave. This order was communicated to Mr. Johnson by letter and circulated throughout the Department via memorandum. The parties disagree as to whether the order was issued in response to firefighter complaints about Mr. Johnson's visits, as Chief Hinton contends. Mr. Johnson asserts that no such complaints were made and that his visits were not disruptive. Mr. Johnson then filed a complaint with the EEOC—his fifth—alleging that Chief Hinton's order was retaliatory in nature. Shortly thereafter, Mr. Johnson returned to work and commenced the present action.

In his complaint, Mr. Johnson relies upon several theories of recovery. The complaint alleges, in ten counts, that the defendants violated his rights under Title VII, 42 U.S.C. § 1981, the First Amendment, the substantive and procedural components of the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. With respect to a number of these claims, Mr. Johnson seeks punitive damages against the City of Fort Wayne.

## II

### DISCUSSION

■ As the district court recognized, the complaint states a number of different theories of recovery, all of which may be characterized as disparate treatment claims. In its order disposing of this case, the district court noted that the lack of clarity in the presentation of the case created serious analytical impediments for the court. Nevertheless, its order carefully attempted to analyze the evidence submitted and to evaluate it in light of the rather cryptic complaint upon which the plaintiff had proceeded. Although we have the duty to evaluate independently the submission of the plaintiff, we have had the benefit of the labors of the district court. We have considered each evidentiary submission of the plaintiff with respect to each of the theories of recovery that can reasonably be said to be stated in the complaint. Considerations of clarity and economy of space counsel against repletion; therefore we simply shall note when a particular submission considered under a particular heading is also germane to another.

■ At the outset, we are mindful that our evaluation of this case must take place in the context of the procedural context in which it was presented to the district court. We exercise plenary review over a district court's grant of summary judgment. *Green v. Shalala,* 51 F.3d 96, 99 (7th Cir.1995). We must evaluate the factual record in the light most favorable to the nonmovant and must resolve all inferences in favor of that party. *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506 (7th Cir.1996). Summary judgment is

appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The initial burden is on the moving party to identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the nonmoving party bears the burden of proof on an issue, he must then go beyond the pleadings and affirmatively demonstrate a genuine issue of material fact for trial. *Id.* at 324, 106 S.Ct. at 2553. That burden is not carried when the party fails to demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### A. *Title VII*

#### 1. Disparate Treatment

"Disparate treatment" occurs when an employee is treated less favorably simply because of religion, color, sex, national origin or, as in our case, race. *See International Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). To be successful on this type of claim, "proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.; see Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1420 (7th Cir. 1986). The complaint alleges disparate treatment in a variety of contexts.

Title VII makes it "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e–2(a)(1). Because Mr. Johnson has not offered any direct evidence of illegal motive, we analyze his claims, as did the district court, under the familiar three-step model of *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *e.g., EEOC v.*

*Our Lady of the Resurrection Medical Ctr.,* 77 F.3d 145, 148–49 (7th Cir.1996).

In order to establish a prima facie case under *McDonnell Douglas,* Mr. Johnson must prove: (1) that he belongs to a protected group; (2) that he performed the job satisfactorily; (3) that he was subjected to an adverse employment action; and (4) that similarly situated employees received more favorable treatment. *See Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir. 1996); *Hughes v. Brown,* 20 F.3d 745, 746 (7th Cir.1994); *King v. General Elec. Co.,* 960 F.2d 617, 621 (7th Cir.1992). Once established, this prima facie case creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 667 (7th Cir.1995); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994).

If the employer meets its burden of production, the presumption dissolves. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). To prevail, the employee then must demonstrate that the nondiscriminatory explanation of the employer is pretextual. *Id.; see Collier v. Budd Co.,* 66 F.3d 886, 893 & n. 11; *see also Hill,* 67 F.3d at 667–68; *Perdomo v. Browner,* 67 F.3d 140, 144–45 (7th Cir.1995). "Pretext ... means a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995). An employee may establish pretext indirectly by proving one of the following: "(1) Defendant's explanation had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) ... the reason stated was insufficient to warrant the [adverse job action]." *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1133 (7th Cir.1994); *see Hill,* 67 F.3d at 669. In trying to establish that an employer's explanation is pretextual, an employee must "focus on the specific reasons advanced by the defendant[s]." *Hughes,* 20 F.3d at 747.

Count I of Mr. Johnson's First Amended Complaint alleges six separate instances of racial discrimination. We shall examine these allegations in chronological order: (1) Payne Brown's directive that Mr. Johnson be excluded from certain policy meetings of the Fire Department; (2) the incident at the Skyway Tavern; (3) the Department's refusal to permit him the use of a Department vehicle while he was on vacation and to provide him with vacation pay at the Assistant Chief grade; (4) Chief Hinton's order that he stay away from fire stations and fire scenes while on sick leave; (5) Chief Hinton's repeated orders that he be evaluated by the City doctor; and (6) his demotion to his prior rank of Lieutenant.

▪ Viewing each of the enumerated instances of mistreatment in isolation, we may read his complaint to allege that he was singled out for less favorable treatment on account of his race. We may also view these instances in the aggregate and read Mr. Johnson's complaint as asserting that the sum of the defendants' discriminatory conduct created a racially hostile work environment. Title VII encompasses both types of claims; its proscriptions are violated either if Mr. Johnson is able to demonstrate that he was treated less favorably than other employees on the basis of his race, see International Bhd. of Teamsters, 431 U.S. at 335 n. 11, 97 S.Ct. at 1854 n. 11, or if discrimination based upon Mr. Johnson's race created a hostile work environment, e.g., Daniels v. Essex Group, Inc., 937 F.2d 1264, 1270 (7th Cir.1991). Accordingly, we evaluate Mr. Johnson's allegations under each of these theories of recovery.

a. Exclusion From Meetings

In his April 19, 1993 complaint to the EEOC, Mr. Johnson charges that "I have not been allowed to assume the full responsibilities and assignments of my position title" and that "[s]ome decisions have been completely taken away from me." R.16, First Am. Compl., Ex.A, at 1. Although Mr. Johnson's complaint does not provide any more specific information, the affidavit of former Fire Chief Robert Barnes explains:

There also were meetings in 1992, after Payne Brown became Safety Director, with all of the Assistant Chiefs, except Johnson, and the Chief, and sometimes the City Attorney attended, to discuss goals, policies and needs of the Fire Department.... Roy Johnson was not allowed to participate in these meetings.... [Payne Brown] said "His presence is not needed" [and] "[w]ell, he's going to be eliminated."

R.30, Affidavit of Robert Barnes, para. 19. Jill Furge, a former executive secretary to the Fire Chief, corroborates Mr. Johnson's exclusion from these upper level meetings in her affidavit:

The Assistant Chiefs would exclude Roy Johnson from regular meetings held that [sic] the Chief and his Assistant Chiefs in the Chief's office.... [Roy Johnson] was the only Black Assistant Chief. All the rest were White, and Roy Johnson was the only one excluded from the regular meetings. I never saw any Assistant Chief other than Roy Johnson excluded from the meetings.

R.30, Affidavit of Jill Furge, para. 9.

▪ As part of his prima facie case of disparate treatment, Mr. Johnson must establish that he suffered a materially adverse change in the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2. Our cases have noted that, although a materially adverse change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities, such a change might be indicated by "significantly diminished material responsibilities," Crady v. Liberty Nat'l Bank and Trust Company of Indiana, 993 F.2d 132 (7th Cir.1993), or by an employer's functional isolation of an employee. See Collins v. State of Illinois, 830 F.2d 692, 703–04 (7th Cir.1987) (finding an adverse employment action where a library employee had been transferred to a new department but her supervisors were unsure of her new responsibilities, she was largely relegated to reference rather than consulting work, and she had lost her office and telephone) (citing cases); cf. Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir.1994) (noting, in the context of an action commenced under 42 U.S.C. § 1983,

that an adverse employment action can result from a materially qualitative change in job responsibilities). Here, we are satisfied that Payne Brown's decision to exclude Mr. Johnson, one of the four Assistant Fire Chiefs in the Department's upper level command, presents, on this summary judgment record, a genuine issue of triable fact as to whether the exclusion is a "materially adverse employment action." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 273 (7th Cir.1996). Fairly read, the record suggests that this exclusion deprived Mr. Johnson of the ability to perform the policy making role essential to the position of an Assistant Chief and, from a functional standpoint, relegated him to an isolation that precluded his fulfilling the responsibilities of the office to which he had been appointed.

We do not think that, on the record before us, summary judgment is appropriate with respect to this claim. The reason given for his exclusion from the early 1992 meetings was that the impending reorganization would eliminate Mr. Johnson from the upper echelon of policy makers in the Department. However, his exclusion from the meetings began, according to former Chief Barnes, almost a full year before the announcement of the reorganization plan in April 1993. At the time that Mr. Johnson was excluded from the meetings, the reorganization study was still in progress, and the City did not have the authority, under its own ordinance, to demote Mr. Johnson to his prior rank of Lieutenant without notice and hearing. Under these circumstances, there is a genuine issue of material fact with respect to Mr. Johnson's exclusion from the meetings.

b. The Skyway Tavern Incident [1]

■ Mr. Johnson contends that the March 24, 1993 incident at the Skyway Tavern would not have occurred had he been white. He asserts that Caucasian Fort Wayne employees regularly park their municipal vehicles at places of public resort without incident, but that he was "arrested, investigated, and embarrassed" for having done so. R.30, Affidavit of Roy Johnson, para. 34. The district court took the view that Mr. Johnson failed to produce any evidence that Payne Brown [2] directed the actions of the police officers who handled the incident and, in any event, that he had failed to show that any of the actions taken that evening were racially motivated.

We agree with the district court. Mr. Johnson has failed to establish a genuine issue of triable fact that Payne Brown—or any of the defendants—played a role in how the Skyway Tavern incident was handled. When Fort Wayne City Police Captain Russell York observed Mr. Johnson's vehicle parked at the Tavern, he notified Steve Hinton, the Fire Department's "on call" Duty Chief. According to Captain York's deposition, Hinton's only instructions to him were as follows: "[I]f you see [Mr. Johnson] leave there and he's driving the vehicle, then you should probably stop him and check to see if he had been drinking." R.30, Deposition of Russell P. York, at 18. But Mr. Johnson did not attempt to leave the tavern and Captain York did not stop Mr. Johnson. Instead, a non-uniformed supervisor in the Police Department, acting on a suggestion from the Police Chief, approached Mr. Johnson in the tavern and made a discreet inquiry as to his sobriety. Although Payne Brown was notified of the situation, there is no evidence that he had any involvement beyond sending a firefighter to the scene to retrieve the City vehicle from the parking lot if Mr. Johnson

---

1. In light of the fact that, on appeal, the parties do not dispute the question of whether the predicate conduct for this claim, if proven, would give rise to Title VII liability, we express no opinion on the issue.

2. The district court ruled that, because the Skyway Tavern incident occurred on March 24, 1993—prior to the filing of Mr. Johnson's April 19, 1993 EEOC complaint—Mr. Johnson could assert a Title VII claim for racial harassment only against Payne Brown, the only defendant

mentioned in that complaint. In light of our conclusion that none of the defendants played a role in determining how the incident was handled, however, we need not address the issue of whether there is a "reasonable relationship" between the allegations in his EEOC charge and the claims in his First Amended Complaint such that this claim could have been brought against the other defendants as well. *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994).

were deemed unfit to drive. Under these circumstances, therefore, it cannot be said that any of the defendants had any significant input into the manner in which Mr. Johnson was treated. There certainly is no evidence that his treatment was motivated by race.

### c. Denial of Vacation Pay at Assistant Chief's Grade

 Mr. Johnson also alleges disparate treatment by the Fire Department's refusal to give him vacation pay at the Assistant Chief grade during his 1993 vacation. Mr. Johnson took approximately three months' vacation leave shortly after the effective date of his demotion to Lieutenant and, during that vacation, he was paid at Lieutenant's grade. In addition to his claim that the Department paid him at the wrong grade, Mr. Johnson asserts that he was wrongfully denied the use of a Department vehicle while on vacation. In support of this claim, he points to the fact that Fire Chief Barnes was permitted the use of a Department vehicle during his 1993 vacation.

According to the Affidavit of former Fire Chief Robert Barnes, Mr. Johnson should have received vacation pay at the Assistant Chief grade. His affidavit explains:

> We accrue our vacation the year before. It is earned the year before you actually get it. In other words, if it's accrued in 1992, it is paid in 1993. For example, Roy Johnson earned his vacation pay in 1992 and it should have been paid as Assistant Chief in 1993, but it wasn't.

R.30, Affidavit of Robert Barnes, para. 38.

Reading former Chief Barnes' affidavit in the light most favorable to Mr. Johnson, it does appear that Mr. Johnson was entitled to vacation pay at the Assistant Chief's grade.

The district court found significant the fact that, at the time Mr. Johnson took his vacation, he already had been demoted to the rank of Lieutenant. Barnes' affidavit clearly states, however, that it is the rank held by Mr. Johnson during the antecedent year—1992—that determines the grade at which his vacation pay ought to have been paid. The City has chosen not to submit any evidence to rebut the submission of former Chief Barnes that Mr. Johnson was entitled to vacation pay at the Assistant Chief grade. Therefore, for purposes of evaluating this summary judgment motion, we must accept former Chief Barnes' account of the pay calculation as true. Assuming that vacation pay in the Fire Department was accrued in the previous year, we must conclude—because it is unrebutted—that Mr. Johnson was treated differently from Chief Barnes with respect to the payment of his vacation pay. With respect to this matter, therefore, he was treated differently from a similarly situated employee. One employee was paid at the rate of his rank during the previous year; the other was not. When read in the light most favorable to Mr. Johnson,[3] former Chief Barnes maintains that it is not significant that he retained his rank during his vacation period while Mr. Johnson did not. Accordingly, Mr. Johnson has established a prima facie case of disparate treatment. The City has chosen not to offer any nondiscriminatory reason for treating Mr. Johnson differently and, in the absence of any explanation from the City,[4] we must conclude that summary judgment ought not to have been granted on this claim.

However, with respect to the use of the vehicle, Mr. Johnson has failed to demonstrate that, as a newly demoted Lieutenant, he was entitled to use a Department vehicle

---

**3.** The City does not contend that Chief Barnes' description of the manner in which vacation pay was determined was inconsistent, at least inferentially, with his own insistence that he retain the Fire Chief's position throughout his vacation period, apparently in order to be paid at that grade. Our examination of Chief Barnes' affidavit does not leave us with the impression that any internal inconsistency renders the document a sham. Rather, we believe that any inconsistencies ought to be examined by the parties and presented as they see fit to the trier of fact.

**4.** The City did not, for instance, supply the district court with the pertinent ordinances or regulations that might have demonstrated that the rate of pay is not determined by one's rank during the earlier year. Of course, if the City has a straightforward explanation for the computation of vacation pay, it can submit that explanation to the district court on remand. Such an explanation is lacking in this record.

while on vacation. It is clear from the record that the Fire Department was allotted only five vehicles and that these vehicles were reserved for use by the Department's upper level command.

### d. Exclusion from Fire Stations during Sick Leave

Mr. Johnson asserts that Chief Hinton singled him out on the basis of race by ordering him to avoid fire stations and fire scenes while on sick leave for job-related stress. According to the affidavits of Chief Hinton and Steve Adams, this order was made in response to numerous complaints they had received from Fire Department personnel, including firefighters Milton Turner and Bruce Walker, about Mr. Johnson's visits. Mr. Johnson responds with affidavits from Turner and Walker denying that they complained to Hinton or Adams about the visits and with affidavits from other Department personnel stating that, to the best of their knowledge, no other employee of the Fire Department has ever been instructed not to visit fire stations or fire scenes while not on duty. He does not rebut Chief Hinton's assertions that the Department received other complaints.

This issue turns on whether Mr. Johnson was treated differently than individuals who were similarly situated. Like the district court, we find it significant that Mr. Johnson was on sick leave due to job-related stress at the time the order was issued. This fact is significant for two reasons. First, the nature of Mr. Johnson's condition serves as the basis for the defendants' legitimate, nondiscriminatory explanation for the order. Whether or not Mr. Johnson's visits were in fact disruptive, Chief Hinton reasonably could have perceived that workplace visits by an employee on paid sick leave would have a negative impact on morale in the Fire Department. As the defendants point out in their submissions to the district court, the frequent appearance at the work site of an employee being paid not to work because of a hard-to-measure disability such as job-relat-

ed stress may be disruptive and upsetting to those co-workers who must continue to report to work every day. It is certainly a reasonable request to expect that persons on sick-leave—and. particularly those on sick leave due to job-related stress—will avoid the work site.

Second, and perhaps more importantly, Mr. Johnson's physical condition at the time of his exclusion dictates the type of evidence that he must introduce to demonstrate that similarly situated individuals were treated differently. Given Mr. Johnson's condition, similarly situated individuals for purposes of proving discriminatory motive or intent are other employees on sick leave for job-related stress. Viewed in light of this important distinction, Mr. Johnson's evidence that no other employee has been ordered to stay away from work sites when off duty simply is insufficient to demonstrate that any similarly situated white employee was treated more favorably. We agree with the district court that Mr. Johnson has failed to present any evidence from which a reasonable factfinder could infer that the defendants lied about the legitimate, nondiscriminatory reason for Chief Hinton's order.

### e. Order to Submit to Physical Evaluation[5]

Mr. Johnson next claims that Chief Hinton unlawfully harassed him by ordering him to be evaluated by the City doctor in late 1993 and early 1994. In support of this position, he relies on the March 23, 1994 letter that contains the second such order. Significantly, however, Mr. Johnson has failed to produce any evidence that other employees' sick-leave medical evaluations were handled differently. The district court correctly concluded that this sparse evidentiary record is insufficient to support a finding that Mr. Johnson was singled out for this treatment on account of his race.

### f. Unlawful Demotion

We turn to the two reasons for Mr. Johnson's demotion that appear from the record:

---

**5.** In light of the fact that, on appeal, the parties do not dispute the question of whether the predicate conduct for this claim, if proven, would give

rise to Title VII liability, we express no opinion on the issue.

(a) insubordination/inadequate job performance; and (b) a reduction in force of the number of upper level policymakers in the Fort Wayne Fire Department. The district court concluded that Mr. Johnson has failed to establish the second element of a prima facie case under *McDonnell Douglas:* that he performed his job satisfactorily. Because this issue is closely related to one of the reasons proffered by the City for his demotion, we shall analyze his claim by "shifting our focus as appropriate" from Mr. Johnson's prima facie burden to his burden of showing pretext. *Taylor v. Canteen Corp.,* 69 F.3d 773, 781 (7th Cir.1995); *see Anderson,* 13 F.3d at 1124 n. 4.

We cannot agree with the district court that, as a matter of law, Mr. Johnson has not met his initial burden of establishing a prima facie case and that he necessarily has failed to rebut the reasons given for his demotion

i.

 We turn first to the issue of inadequate job performance. At his deposition, Payne Brown, Safety Director of the City of Fort Wayne, testified that his displeasure with Mr. Johnson stemmed from perceived insubordination in the City's attempt to implement a random drug-testing policy for its firefighters. Mr. Johnson concedes that his disagreement with Brown about the drug-testing program was unrelated to his race.[6] In light of this concession, Mr. Johnson's evidentiary submission to support the proposition that he had performed satisfactorily cannot carry the day. Statements of Mr. Johnson's co-workers and former supervisors giving their favorable assessment of his work habits are insufficient to create a genuine issue of triable fact on the issue of whether Mr. Johnson performed his job satisfactorily in the eyes of Payne Brown and Mayor Helmke, the parties responsible for his demotion. *See Dey v. Colt Constr. & Dev. Co.,*

28 F.3d 1446, 1460 (7th Cir.1994) (noting that such evidence "does not shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases"); *Anderson,* 13 F.3d at 1124–25.

Mr. Johnson also submits evidence on the issue of satisfactory job performance consisting of affidavits designed to show that he had done everything possible to bring about a drug testing program that comported both with Brown's wishes and with the firefighters' collective bargaining agreement. To the extent that this evidence is intended to demonstrate that Brown is mistaken in his view, it is, for the reason we have just stated, not relevant. To the extent that this evidence is intended to support the proposition that Brown took an unreasonable and, by inference, an insincere view of Mr. Johnson's performance, it cannot help Mr. Johnson resist summary judgment in light of his statement that he had a disagreement with the Safety Director about drug testing and that the disagreement had nothing to do with race. With respect to this proffered reason for his demotion, therefore, Mr. Johnson has failed to meet his burden of establishing pretext.

This does not end the inquiry. Although the record does not disclose a genuine issue of triable fact with respect to the validity of this reason given by the City for Mr. Johnson's demotion, it is unclear whether this disagreement, standing alone, would have resulted in his demotion. It is not clear from the record whether the City relies upon Mr. Johnson's insubordination as an independent justification for his demotion or asserts that his insubordination in this matter was simply a factor in the final decision to demote him as a part of the reduction in force. On this record, therefore, we cannot say that Mr. Johnson's perceived insubordination, stand-

---

**6.** At his deposition, Mr. Johnson testified as follows:

 Q. In fact, [Payne Brown] got quite upset with you after a certain meeting, did he not?

 A. He certainly did.

 Q. And do you have any reason to believe that the reason he was upset with you was because of your race?

 A. On this particular issue, no, race—

 Q. On the random drug testing?

 A. On the random drug testing, no, it had nothing to do with race.

 R.20, Deposition of Roy Johnson, at 24.

ing alone, supports the entry of summary judgment against him on the unlawful demotion claim.

ii.

We now examine whether Mr. Johnson has failed to carry his burden of demonstrating that the reduction in force was a pretext. According to the City, Mr. Johnson was demoted when his position was eliminated during a reduction in the number of upper level policymakers in the Fire Department; the reduction was designed to realize a budgetary savings in the Department's management payroll. In support of his contention that no real reorganization occurred, Mr. Johnson points to the fact that he, the only African-American Assistant Chief, was the only Assistant Chief left without an upper level management position following the reorganization. He further invites our attention to the affidavit of former Chief Barnes indicating that, following the reorganization, the number of upper level positions remained the same, the Department did not run any more efficiently, Mr. Johnson's duties were still being performed, and the total budget for the Department had not decreased.

The evidentiary materials submitted to the district court, which include budgetary and staffing materials, fail to refute the City's submission that the reorganization was a legitimate, nondiscriminatory reason for Mr. Johnson's demotion. Those materials, at least when considered alone, demonstrate that the Department did in fact implement a reorganization plan and that the plan resulted in the elimination of several upper level positions and in the realignment of duties performed by others. When viewed in this light, Chief Barnes' affidavit speaks more to the efficacy of the reorganization plan than to the fact of its occurrence. For example, Chief Barnes' most potent assertion—that

the total budget for the Fire Department has not decreased since the reorganization—does not address the gross savings in management payroll, if any, realized by the Fire Department as a result of the reorganization. Indeed, even if the savings was not realized, the simple failure of the program to achieve its goals, standing alone, would not establish pretext. *See Russell,* 51 F.3d at 68. Like Mr. Johnson's other arguments with respect to pretext, Chief Barnes' assertions do not bear on the sincerity of the City's reliance on the reduction in force as the reason for his demotion and, as such, are ineffectual to preclude summary judgment. *Visser v. Packer Eng'g Assocs., Inc.,* 924 F.2d 655, 657 (7th Cir.1991) (en banc).

There is, however, another factor that must be considered with respect to the reorganization. We already have noted that there exists a genuine issue of triable fact with respect to two other instances of alleged disparate treatment—the Department's denial of Mr. Johnson's vacation pay at the proper grade and his exclusion from the meetings. If Mr. Johnson is able to establish that he was subjected to disparate treatment on account of his race with respect to these two incidents, he will be entitled to argue that these instances of racial animus amount to relevant and probative evidence of the City's true intention motivating his demotion.

Finally, we emphasize again that, even if Mr. Johnson is able to establish racial animus with respect to the reorganization, he cannot prevail if the City is able to establish that his disagreement with Brown over the drug testing program, an issue which Mr. Johnson admits was not infected with racial animus, was, standing alone, sufficient to justify the demotion. *See Russell,* 51 F.3d at 68.[7] As we have noted earlier, the present

---

7. As the court also noted in *Russell,* "[t]here may be cases in which the multiple grounds offered by the defendant for the adverse job action ... are so intertwined, or the pretextual character of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Russell,* 51 F.3d at 70. In *Russell,* this court considered allegations of discrimination for which the employer had offered a number of seemingly independent, nondiscriminatory explanations. Despite the plaintiff's success in casting doubt on some of the employer's reasons, we upheld summary judgment because one reason—the employer's dissatisfaction with the plaintiff's job performance—survived. *Id.* at 69. We recognized, however, that employment decisions are sometimes motivated by a number of related grounds and that, in a proper case, a plaintiff might survive summary judgment even though he has failed to rebut all of the reasons proffered by the employer for an adverse job action. *Id.* at 70.

state of the record does not permit a definitive adjudication of this matter.

## 2. Harassment

Mr. Johnson has also alleged that the defendants engaged in a pattern of discriminatory conduct designed to harass him.

Title VII prohibits an employer from engaging in racial harassment that creates a hostile or offensive working environment. *Patterson v. McLean Credit Union,* 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Daniels,* 937 F.2d at 1270. As the Supreme Court recognized in *Meritor,* "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2405. This court repeatedly has recognized that racial harassment is an independent basis for a Title VII claim. *E.g., Daniels,* 937 F.2d at 1270; *Nazaire v. Trans World Airlines, Inc.,* 807 F.2d 1372, 1380 (7th Cir.1986), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987). Mr. Johnson does not allege that he was subjected to racial slurs, epithets, or other overtly race-related conduct in the workplace. His allegations of harassment do not fit neatly into the traditional analysis of a hostile work environment claim. *See, e.g., Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 674–76 (7th Cir.1993); *Daniels,* 937 F.2d at 1266–67. In addition, we do not believe that the incidents of alleged disparate treatment that present a genuine issue of triable fact, even if proven at trial, can be characterized as rising to the level of a racially hostile working environment.

Mr. Johnson also relies upon the unsupported conclusions of various Department personnel that an atmosphere of bias and prejudice existed in the Department and that Payne Brown discriminated against other African–Americans to curry favor with his white peers. Absent specific allegations of discriminatory or harassing conduct directed at Mr. Johnson,[8] we agree with the district court that this evidence is insufficient to support any claim of a racially hostile work environment. We do not have in this record "the quantity, frequency, and severity" of racial slurs that "create a work environment so hostile as to discriminate against the minority employee." *Vore v. Indiana Bell Telephone,* 32 F.3d 1161, 1164 (7th Cir.1994). The evidence is insufficient to show that "the workplace is permeated with discriminatory intimidation, ridicule or insult that is sufficiently severe or pervasive to alter the conditions of [Mr. Johnson's] employment and create an abusive working situation." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

## 3. Retaliation

Section 704 of Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action by the

As a corollary to this proposition, we note that there may be cases, like the present one, in which further development of the record is necessary to discern the relatedness of the employer's motivations. *See Wolf v. Buss (America) Inc.,* 77 F.3d 914, 920 (7th Cir.1996), *petition for cert. filed,* —— USLW —— (U.S. July 16, 1996) (No. 96–92).

8. The only evidence of race-related conduct in the workplace appears in the affidavit of Jill Furge, then executive secretary to the Fire Chief. Ms. Furge states that Chief Hinton made dispar-

aging racial remarks about Mr. Johnson outside of his presence, that he did not like Jerome Gaines, another African–American firefighter, and that Chief Hinton maintained a racist atmosphere in the Fire Chief's office. There is no evidence in the record, however, that Mr. Johnson was exposed to any of this racial hostility. Indeed, at his deposition, Mr. Johnson conceded that he has never heard either of his principal antagonists—Mayor Helmke or Payne Brown— make any statement to indicate that either one is biased or prejudiced against African–Americans.

employer; and (3) there was a causal link between the protected expression and the adverse action. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995); *Brenner v. Brown,* 36 F.3d 18, 19 (7th Cir.1994) (per curiam). In order to demonstrate the "causal link," the plaintiff must demonstrate that the employer would not have taken the adverse action "but for" the protected expression. *Johnson,* 70 F.3d at 479; *Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280 (7th Cir.1985).

In his First Amended Complaint, Mr. Johnson asserts that the defendants unlawfully retaliated against him for the exercise of rights secured to him by Title VII: making an informal complaint to the City's EEOC officer in 1992 and filing formal charges with the EEOC. In chronological order, Mr. Johnson contends that the defendants retaliated against him by: (a) directing that he be harassed at the Skyway Tavern; (b) demoting him to his prior rank of Lieutenant; (c) wrongfully denying him vacation pay at the Assistant Chief's grade and denying him the use of a city vehicle while on vacation; (d) failing to consider him for the newly created Assistant Chief (Combat) position; and (e) ordering him to stay away from fire stations and fire scenes while off duty.

#### a.

■ With respect to the incident at the Skyway Tavern, we already have concluded that Mr. Johnson has failed to produce sufficient evidence from which a rational factfinder could infer that Payne Brown, or any of the defendants, directed the actions of the police officers who handled the incident. Absent such proof, Mr. Johnson is unable to establish that there is a causal connection between his protected activity and the manner in which the incident was handled. This claim of retaliation must fail.

#### b.

Mr. Johnson next asserts that the defendants retaliated against him by demoting him to his prior rank of Lieutenant. In light of our earlier determination that there is a controverted issue of fact with respect to this matter, we cannot say that this claim is foreclosed on this record.

#### c.

■ Mr. Johnson next submits that the defendants retaliated against him by wrongfully denying him vacation pay at the Assistant Chief's grade and by denying him the use of a Department vehicle while on vacation. Earlier in this opinion, we concluded that a genuine issue of triable fact exists with respect to Mr. Johnson's right to vacation pay at the higher grade. We must conclude, moreover, that Mr. Johnson has established a prima facie case of retaliation with respect to this denial. A reasonable inference of retaliation arises from the fact that the denial came only two weeks after Mr. Johnson filed his April 19, 1993 EEOC complaint. *See Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir. 1989) (one week between complaint and adverse job action sufficient to create a factual issue on the question of causation); *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42–43 (5th Cir.1992) (finding two-month period between EEOC's dismissal of plaintiff's complaint and adverse job action evidence of retaliation). Accordingly, we reverse the entry of summary judgment on the claim that defendants retaliated against him by failing to provide him with vacation pay at the proper grade and remand the claim to the district court for further proceedings.[9]

#### d.

■ Mr. Johnson also claims retaliation stemming from the defendants' failure to

9. As an alternative basis for disposing of Mr. Johnson's retaliation claim, the district court took the view that Mr. Johnson had not established a prima facie case of retaliation because he did not have a reasonable belief that the conduct charged in his April 19, 1993 EEOC complaint violated Title VII. *See Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1314 (7th Cir.1989) (noting that, in order to engage in statutorily protected expression, a plaintiff must have at least a reasonable belief that he is challenging conduct that violates Title VII). Because we believe that some of the allegations of Mr. Johnson's EEOC complaint state colorable violations of Title VII, we do not believe that summary judgment against Mr. Johnson can be granted on this ground.

consider him for the newly created Assistant Chief (Combat) position. With respect to this claim, the district court took the view that Mr. Johnson had made out a prima facie case of retaliatory discrimination but that he had failed to refute the legitimate, nondiscriminatory reason offered by the defendants: Mr. Adams was the most qualified candidate. We agree with the district court that Mr. Johnson's evidence of pretext, which consists primarily of affidavit testimony from coworkers that Mr. Johnson was also qualified for the position, is insufficient to cast doubt on the defendants' proffered reason. *E.g., Dey,* 28 F.3d at 1460 ("Our cases give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."); *Anderson,* 13 F.3d at 1124–25.

### e.

Mr. Johnson's next retaliation claim, which arises out of Chief Hinton's order that he stay away from fire stations and fire scenes while on sick leave, fails. He has failed to refute the defendants' legitimate, nondiscriminatory explanation for the exclusion: Chief Hinton's legitimate concerns about the impact of Mr. Johnson's visits on morale in the Department. With respect to this claim, therefore, Mr. Johnson has failed to establish that the order would not have been given "but for" his protected activity. *See John-son,* 70 F.3d at 479.

### B. *42 U.S.C. § 1981*

In Count II of his complaint, Mr. Johnson realleges the factual predicate for his Title VII claims and asserts a right of recovery under 42 U.S.C. § 1981. Relying on its detailed analysis of Mr. Johnson's Title VII claims, the district court ruled that the defendants are also entitled to summary judgment on the section 1981 claims contained in Count II.

■ Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts, ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical. *Von Zuckerstein v. Argonne Nat'l Laboratory,* 984 F.2d 1467, 1472 (7th Cir.), *cert. denied,* 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993); *Bailey v. Northern Indiana Pub. Serv. Co.,* 910 F.2d 406, 410 (7th Cir.1990). Consistent with the foregoing analysis of Mr. Johnson's Title VII claims, therefore, we must reverse those aspects of the § 1981 claim that state the same allegations as the Title VII allegations we have held to be viable on this record.

### C. *Exclusion from Fire Department Property*

In Counts III and IX of his First Amended Complaint, Mr. Johnson asserts that the defendants violated his First Amendment right to freedom of association when they ordered him to refrain from visiting fire stations and fire scenes while on sick leave. In Count III, Mr. Johnson further alleges that the order violates his "rights of liberty and the pursuit of happiness secured to him under the Fourteenth Amendment to the Constitution of the United States." R.16, First Am.Compl., para. 36.

Mr. Johnson contends that a sufficient factual basis exists to support a finding that these constitutional rights have been violated. In support of this position, he invites our attention to the affidavits of Department personnel indicating that his visits were not disruptive and that they could not recall a Caucasian firefighter—or any other firefighter for that matter—being ordered to stay away from a fire station while off duty. In his own affidavit, Mr. Johnson states that white firefighters routinely stop by fire stations where they do not work.

### 1. First Amendment

The district court took the view that, for purposes of Mr. Johnson's First Amendment claim, the Fort Wayne fire stations at issue are nonpublic forums. The court held the directive ordering Mr. Johnson to avoid fire stations to be a reasonable one in light of the vital public safety function served by fire stations. Noting that Mr. Johnson has failed

to produce any evidence that the restrictions on his access to the fire stations were viewpoint based, the district court entered summary judgment in favor of the defendants on his First Amendment claim. As an alternative basis for its ruling, the district court concluded that Mr. Johnson—a public employee—had failed to introduce sufficient evidence to inform the court whether his intended association or conversation touched upon a matter of public concern. *See Marshall v. Allen,* 984 F.2d 787, 798 (7th Cir.1993) (holding that the First Amendment protects a public employee from adverse employment action for the exercise of associational rights only where the associational conduct relates to a matter of public concern).

We begin our discussion, as did the district court, with what the Supreme Court has termed "forum analysis." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). We engage in this analysis because, as recently stated by the Supreme Court, "[t]he right to use government property for ... private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses." *Capitol Square Review and Advisory Bd. v. Pinette,* —— U.S.——, ——, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995); *see Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448 ("[T]he extent to which the Government can control access depends on the nature of the relevant forum.").

In *Cornelius,* the Supreme Court succinctly defined and differentiated the three classifications of forums. The "traditional public forum" is one that " 'by long tradition or by government fiat [has] been devoted to assembly and debate.' " *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). The second—a limited or designated public forum—is one "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for discussion of certain subjects." *Id.* The final classifica-

tion—the nonpublic forum—describes an area that the government "may reserve ... for its intended purposes," *Perry,* 460 U.S. at 46, 103 S.Ct. at 955, and one to which the government may control or limit access. *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451; *see also International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678–79, 112 S.Ct. 2701, 2705–06, 120 L.Ed.2d 541 (1992).

Under the circumstances of the instant case, we agree with the district court's conclusion that the Fort Wayne fire stations are nonpublic forums. Municipal fire stations do not have as their "principal purpose ... the free exchange of ideas" so as to qualify as traditional public forums. *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448. There is no evidence, moreover, that the City of Fort Wayne intended its fire stations to be places of assembly and public discourse for its citizens. Nor are we permitted to infer such an intent. *Id.* at 802, 105 S.Ct. at 3449 (noting that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse"); *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. We agree with the district court that, in this case, "[t]he purpose of the property (performing a vital public safety function) is so obviously inconsistent with expressive activity the court will not infer that the government intended to create a public forum." R.42, Order of March 24, 1995, at 47. Fort Wayne's fire stations must be classified as nonpublic forums.

The government may control access to a nonpublic forum, restricting identifiable subjects or speakers, if two criteria are met: (1) the restrictions must be reasonable in light of the purpose of the forum and the surrounding circumstances; and (2) the restrictions must be viewpoint neutral. *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 392, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993); *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451. Chief Hinton's order to avoid the workplace satisfies each of these requirements. As we noted in our discussion of Mr. Johnson's Title

VII claim, Chief Hinton and Chief Adams reasonably could have perceived that frequent workplace appearances by an employee on paid sick leave for job-related stress may be disruptive and upsetting to firefighters who must report to work every day in order to continue to receive their wages. Visits by such an employee could have a negative impact on firefighter morale and impair the Department's ability to perform the vital public safety function entrusted to it. Chief Hinton's order to avoid the workplace while on sick leave is a reasonable response to these legitimate concerns. *See Cornelius*, 473 U.S. at 808, 105 S.Ct. at 3452 (noting that the government's "decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation.... [A] finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated.").

■ Chief Hinton's order to avoid the workplace satisfies the requirement of viewpoint neutrality as well. Mr. Johnson simply has failed to introduce any evidence from which we may infer that Chief Hinton enjoined Mr. Johnson from visiting the workplace "solely to suppress the point of view he espouses on an otherwise includible subject." *Id.* at 806, 105 S.Ct. at 3451.[10] The record will not support a jury verdict that Chief Hinton would have allowed Mr. Johnson's visits if he had spoken on another topic. Accordingly, we affirm the judgment of the district court with respect to Mr. Johnson's First Amendment claims.

### 2. Fourteenth Amendment

The district court interpreted Mr. Johnson's Fourteenth Amendment claim to allege that Chief Hinton's order violated his right to substantive due process. Even though Mr.

Johnson's intended association and conversation may not touch upon a matter of public concern and thus may not be protected by the First Amendment, the court noted, arbitrary restrictions on his freedom to engage in social association and casual conversations may give rise to a substantive due process violation. Citing to its earlier conclusion that the restriction was reasonable, the court concluded that the restriction was not "arbitrary."

■ This matter does not require extensive discussion or analysis. It is enough to say that we agree with the district court that a sufficiently important governmental interest was asserted by the City to outweigh whatever liberty interest Mr. Johnson may have had in visiting the fire stations during his sick leave.

■ Mr. Johnson further contends that Chief Hinton's order to avoid fire stations while on sick leave violates his Fourteenth Amendment right to equal protection. As set forth in our discussion of Mr. Johnson's Title VII claims, however, he has failed to introduce any evidence that similarly situated persons—other firefighters on sick leave for job-related stress—were treated any differently. Because this failure is fatal to any equal protection claim arising out of Chief Hinton's order, summary judgment was properly granted to the defendants on this claim as well.

### D. *Procedural Due Process*

In Counts V and VI of his First Amended Complaint, Mr. Johnson asserts that the defendants unlawfully demoted him from the rank of Assistant Fire Chief without notice and a hearing in violation of his Fourteenth Amendment due process rights. The district court took the view that Mr. Johnson's claim necessarily fails because, under the relevant

---

10. Mr. Johnson's purpose in visiting the fire stations while on sick leave is not altogether clear. The most precise explanation appears in the affidavit of Milton Turner:

Before and after Roy Johnson was demoted, he came to my firehouse, as did other African–American Fire Fighters. We meet for breakfast at least several times each month to discuss what is going on in the Department, be-

cause we African–American Fire Fighters are isolated and not kept informed about what is going on in the Department. We need to know so we can do a better job as Fire Fighters for the citizens of Fort Wayne. These breakfast meetings are not gripe sessions. They are to exchange information so we can do a better job, and discharge our obligations better.
R.30, Affidavit of Milton Turner, para. 2.

state statutes and municipal ordinances, Mr. Johnson does not have a protected property interest in that position.

 In order to assert a Fourteenth Amendment due process claim, Mr. Johnson must demonstrate that he possessed a property interest in his position of Assistant Chief (Labor Relations) that is protected by the Constitution. Such property interests "are not created by the Constitution," but rather "are created and their dimensions ... defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *see Perry v. Sindermann,* 408 U.S. 593, 602 n. 7, 92 S.Ct. 2694, 2700 n. 7, 33 L.Ed.2d 570 (1972); *Miller v. Crystal Lake Park Dist.,* 47 F.3d 865, 867 (7th Cir.1995).

 A protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract—those "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Border v. City of Crystal Lake,* 75 F.3d 270, 273 (7th Cir.1996) (quoting *Domiano v. Village of River Grove,* 904 F.2d 1142, 1147 (7th Cir.1990) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709)); *see Hohmeier v. Leyden Community High Schs. Dist.* 212, 954 F.2d 461, 464 (7th Cir.1992) (state agency regulation and municipal ordinance). Because Mr. Johnson was employed as an Assistant Fire Chief in Indiana, we look to Indiana law to determine whether he had a property interest in that position. *Border,* 75 F.3d at 273.

 Indiana Code section 36–8–3–4(b) provides that, "except as provided in [section 36–8–3–4(m)]," a firefighter may be dismissed only for cause and after opportunity for a hearing. Ind.Code. § 36–8–3–4(b). However, section 36–8–3–4(m) provides:

The executive may reduce in grade any member of the police or fire department who holds an upper level policy making position. The reduction in grade may be made without adhering to the [procedural safeguards found in] subsections (b)

through (*l*). However, a member may not be reduced in grade to a rank below that which the member held before the member's appointment to the upper level policy making position.

Ind.Code § 36–8–3–4(m). In *Lohorn v. Michal,* 913 F.2d 327 (7th Cir.1990), we recognized that this provision is an obstacle to any claim of a property interest in an "upper level policy making position." *Id.* at 335. Local ordinances, however, may create a firefighter's property interest in such a position by restricting the municipal executive's authority to exercise the removal power authorized by section 36–8–3–4(m). *See Hohmeier,* 954 F.2d at 464; *Domiano,* 904 F.2d at 1148; *e.g., Myers v. City of Fort Wayne, Indiana,* 729 F.Supp. 625, 630–32 (N.D.Ind. 1990).

Mr. Johnson contends that Fort Wayne City Ordinance G–29–75, enacted in 1975, creates the necessary property interest in his position as Assistant Chief. Section 2 of this ordinance provides:

With the exception of the Chief, every member of the Fire Department appointed by the Mayor shall hold his present rank, or such rank as he may hereafter attain, unless and until he is demoted by the Board in compliance with terms of this Ordinance. A member may be demoted only for cause other than politics, after written notice from the Chief is served upon him ... notifying him of the time and place of a hearing.

Fort Wayne, Ind., Ordinance G–29–75 (Dec. 8, 1975). We agree with the district court, however, that whatever property right Mr. Johnson possessed in his position as Assistant Fire Chief was eliminated when the Fort Wayne Common Council enacted City Ordinance G–06–93. Section 2(B) of that ordinance provides:

The Mayor may reduce in rank any member of the Fire Department who holds an upper level policymaking position, as provided in I.C. 36–8–3–4(m), provided that the member is not reduced to a rank below that which he held prior to his appointment to the upper level policymaking position.

Fort Wayne, Ind., Ordinance G–06–93 (Feb. 24, 1993). Section 3 of the ordinance repeals all prior limitations on that authority. With the enactment of this ordinance, therefore, all those in "upper level policy making positions" in the Fort Wayne Police and Fire Departments—including Mr. Johnson—were returned to the position of being subject to removal under section 36–8–3–4(m).

Mr. Johnson responds that City Ordinance G–06–93 was procured by the defendants in an attempt to remove him from his position and, as such, is "special legislation" that is void under Indiana's Constitution. Aside from conclusory allegations that the statute was targeted specifically at him, Mr. Johnson points only to the fact that no effort was made to repeal City Ordinance G–29–75 until just before his demotion.

■ We shall assume, without deciding, that Mr. Johnson is correct in stating that the Indiana Constitution would prohibit a local ordinance targeted at a particular individual. We are unpersuaded, however, that City Ordinance G–06–93 can be classified as "special legislation." It is general in scope, applying to all "upper level policy making positions" in the Fire Department. Moreover, the ordinance contains an identical provision reestablishing the Mayor's power to remove persons in upper level policy making positions in the Fort Wayne Police Department.

Mr. Johnson asks us to infer, from the timing of its enactment, that City Ordinance G–06–93 was aimed specifically at him. The ordinance was enacted on February 24, 1993—approximately one month before Payne Brown submitted his reorganization plan to Mayor Helmke for approval. However-

er, because the reorganization study was nearing completion, it is not surprising that the City would seek to enact an ordinance that would streamline the anticipated reduction in the number of upper level positions in the Fire Department.[11]

■ Mr. Johnson is left to argue, therefore, that his was not an "upper level policy making position" within the meaning of Indiana Code section 36–8–3–4(m) and City Ordinance G–06–93. For departments with an authorized size of the Fort Wayne Fire Department, this term is defined by the Indiana Code as "the position held by the police or fire chief and . . . each position held by the members of the police department or fire department in . . . the next two (2) ranks and pay grades immediately below the chief." Ind.Code § 36–8–1–12(2). At the time of his demotion, Mr. Johnson, as one of four Assistant Chiefs operating directly below the Fire Chief, clearly met this statutory criterion; his arguments to the contrary are wholly without merit.[12] Summary judgment, therefore, was properly granted to the defendants on Mr. Johnson's procedural due process claim.

### E. *Equal Protection*

■ In Counts V, VI, and VII of his First Amended Complaint, Mr. Johnson alleges that certain actions taken by the defendants denied him equal protection of the law. In order to establish a prima facie case of discrimination under the Equal Protection Clause, Mr. Johnson is required to demonstrate, *inter alia*, that he "is otherwise similarly situated to members of the unprotected class" and that he "was treated differently

---

11. In his deposition, Payne Brown testified:
 Q. What did you desire to accomplish through [G–06–93]?
 A. In the reorganization that we had talked about eliminating some positions, and this would have allowed us to do that.
 \* \* \* \* \* \*
 Q. Did you recommend that Roy [Johnson] be released as Assistant Chief?
 A. I recommended that we reorganize. And as a part of that reorganization that the position of Assistant Chief of Labor Relations be eliminated.
 R.30, Deposition of Payne Brown, at 157–58.

12. Mr. Johnson argues, for example, that, even if the Assistant Chief position is technically considered an "upper level policy making position," there is a genuine issue of fact on the question because he was excluded from certain policy making meetings. The statute, however, does not define "upper level policy making position" in terms of actual policymaking authority. Because the term is defined solely by the degree of removal from the Fire Chief position, and because the Assistant Chief (Labor Relations) position falls squarely within that definition, we are unpersuaded by this line of argument.

from members of the unprotected class." *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir.1993); *McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir.1989). Mr. Johnson is also required to demonstrate that the defendants acted with discriminatory intent. *McNabola*, 10 F.3d at 513; *Sims v. Mulcahy*, 902 F.2d 524, 539 (7th Cir.), *cert. denied*, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990).

■■■ Count V alleges that Mr. Johnson was "fired without notice and without a hearing." R.16, First Amended Compl. para. 12. To the extent that such an allegation can be said to state an equal protection claim, he has failed to allege or demonstrate, as he must, that any other police officer or firefighter in an upper level policy making position was given notice and a hearing before being demoted to the rank that individual held prior to being appointed to the policy making position. Summary judgment is proper with respect to Count V.

Count VI alleges that the defendants who are members of the Fort Wayne Common Council denied him equal protection of the law "by terminating him and removing him from his position as Assistant Fire Chief, and by enacting a special ordinance with the sole purpose and intent to create a legal basis for terminating [him] from his position as Assistant Fire Chief." R.16, First Amended Compl. para. 45.

On appeal, Mr. Johnson disclaims any intent to state a cause of action against the Fort Wayne Common Council. According to Mr. Johnson's reply brief, his only claim is that Ordinance G–06–93 could not be used against him because it was special legislation and because Payne Brown, who had violated his constitutional rights, had procured its passage. We have addressed these arguments in our discussion of Mr. Johnson's procedural due process claim and, for the reasons set forth therein, we affirm the entry of summary judgment with respect to Count VI.

In Count VII, Mr. Johnson contends that the defendants have maintained a practice and custom of discriminating against Mr. Johnson in promotion and job assignments. As we have discussed previously, the district court found this claim to be totally unsupported by the evidence presented. To the extent that Mr. Johnson presses this contention on appeal, we agree with the district court's assessment and affirm the entry of summary judgment on Count VII.

F. *Attorneys' Fees and Costs*

■■■ After the district court entered its March 24, 1995 order awarding summary judgment in favor of the defendants on all counts, the defendants, as the prevailing parties, filed a request for attorneys' fees pursuant to 42 U.S.C. § 2000e–5(k) and 42 U.S.C. § 1988. The defendants included a request that Mr. Johnson's attorneys share in any fee award under 28 U.S.C. § 1927.[13]

The district court analyzed each of Mr. Johnson's claims against the standards set forth in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), and, determining them to be either legally frivolous or without factual support, awarded attorneys' fees to the defendants under sections 2000e–5(k) and 1981. Finding that Mr. Johnson's attorneys had exhibited a lack of preparation and review, the court granted defendants' request that they share liability for the fee award under section 1927.

Because we have determined that some of the contentions survive summary judgment on the record before us, we must vacate the decision of the district court and remand this matter for redetermination in light of this opinion. The district court shall have to revisit the matter of attorneys' fees at the conclusion of the proceedings on remand. At that time, the district court will be in a position to reassess the defendants' fee request. If, at that time, the district court concludes that the defendants are still entitled to attorneys' fees and costs, the district

**13.** That section provides:

Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

court will have the discretion to impose another award.

■ Because this matter is very likely to arise again, we note that the district court committed no error of law in its recitation of the pertinent authorities. We also believe that the district court correctly focused on the obvious lack of selectivity on the part of plaintiff's counsel in crafting the allegations of the complaint. We also suggest respectfully that any future award imposed by the district court delineate with more precision the responsibility of the plaintiff and the responsibility of his counsel for the award. *See* 28 U.S.C. § 1927 (imposing liability on attorneys for the "excess costs, expenses and attorneys' fees reasonably incurred because of such conduct"). Our own examination of the record leads us to the conclusion that this last consideration is of prime importance in assessing responsibility for the poor conduct of the plaintiff's case. This is a matter, however, in which the judgment of the district court, which has a far more intimate knowledge of how the record was developed, must be given great deference.

### Conclusion

For the reasons stated in this opinion, the judgment of the district court is affirmed in part, reversed in part and vacated in part. The case is remanded to the district court for further proceedings in conformity with this opinion. The parties shall bear their own costs in this court.

AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; REMANDED.