In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2142

SANDOR DEMKOVICH,

*Plaintiff-Appellee,*

*v.*

ST. ANDREW THE APOSTLE PARISH, CALUMET CITY, and THE ARCHDIOCESE OF CHICAGO,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-11576 — **Edmond E. Chang**, *Judge.*

ARGUED NOVEMBER 5, 2019 — DECIDED AUGUST 31, 2020

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The First Amendment prohibits enforcement of federal employment discrimination statutes against decisions of churches and other religious organizations to hire or fire their "ministerial employees." *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Hosanna–Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012). This interlocutory appeal presents

a question about extending this exemption beyond hiring and firing decisions: should the constitutional exemption be extended to categorically bar all hostile environment discrimination claims by ministerial employees, even where there is no challenge to tangible employment actions like hiring and firing? Our answer is no.

In the United States legal system, encounters between churches and civil law are always fraught. Such cases, including this one, can pose a tension between two valued legal goods: constitutional protection of the freedom of religion and other legal rights. In such cases, the courts have a long history of balancing and compromising to protect religious freedom while enforcing other important legal rights. The problem here is particularly sensitive, involving tension between the freedom of religion and employees' rights to be free from invidious discrimination, also a compelling governmental interest. E.g., *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14 n.5 (1988). The problem is not so sensitive as to preclude line-drawing altogether.

Defendants urge us to bar all statutory hostile environment claims by ministerial employees. Recognizing the history of balance and compromise, defendants acknowledge that the First Amendment does not bar those same ministerial employees from bringing contract and tort claims against their employers and supervisors. Nor does the First Amendment bar enforcement of criminal laws arising from mistreatment of those same employees. Plaintiff argues that churches do not need, as a matter of constitutional law, complete protection from statutory harassment claims so long as they do not challenge any tangible employment actions used to select and control ministerial employees.

The right balance is to bar claims by ministerial employees challenging tangible employment actions but to allow hostile environment claims that do not challenge tangible employment actions. Religious employers' control over tangible employment actions—hiring, firing, promoting, deciding compensation, job assignments, and the like—provides ample protection for the free exercise of religion. The First Amendment does not require complete immunity from the sometimes horrific abuse that defendants' bright-line rule would protect.

Sensitive issues of potential entanglement, to use the language of Establishment Clause jurisprudence, lie ahead. We are not persuaded, however, that they cannot possibly be managed in a balanced way that protects both religious liberty and the rights of employees to be free from discriminatorily hostile work environments. In so holding, we join the Ninth Circuit, see *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir. 1999); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004), and depart from the Tenth, see *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010).

I.  *Factual Allegations and Procedural Background*

We review here a ruling on a motion to dismiss under Rule 12(b)(6), so we treat as true the factual allegations of the operative complaint. E.g., *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 648 (7th Cir. 2017).

Plaintiff Sandor Demkovich was hired in 2012 as the music director at St. Andrew the Apostle Parish, a Catholic church in Calumet City, Illinois. He was fired in 2014. Demkovich is

gay. When he was hired, he had been with his partner (now husband) for over a decade. He also was overweight and suffered from diabetes and metabolic syndrome, and he had these conditions before St. Andrew hired him.

Demkovich's supervisor was Reverend Jacek Dada. According to Demkovich, Reverend Dada subjected him to a hostile work environment based on his sexual orientation and his disabilities.[1] Demkovich alleges that Reverend Dada repeatedly and often subjected him to comments and epithets showing hostility to his sexual orientation, and increased the frequency and hostility after learning that Demkovich intended to marry his partner and again as the date of the ceremony approached. After the ceremony, Reverend Dada demanded Demkovich's resignation because his marriage violated Church teachings. Demkovich refused, and Reverend Dada then fired him.

Demkovich also alleges that Reverend Dada repeatedly harassed and humiliated him based on his weight and medical issues. According to Demkovich, his job did not call for any particular physical-fitness requirements, and Reverend Dada never connected his disparaging and humiliating comments to Demkovich's job performance. Demkovich alleges

---

[1] After oral argument in this appeal, the Supreme Court held that discrimination on the basis of sexual orientation amounts to discrimination based on sex, generally prohibited in employment under Title VII of the Civil Rights Act of 1964. *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020); accord, *Hively v. Ivy Tech Cmty. College* 853 F.3d 339 (7th Cir. 2017) (en banc). Also, hostile environment claims may be pursued under the Americans with Disabilities Act. *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 852 (7th Cir. 2019).

that Reverend Dada's harassment on both grounds "humili-ated and belittled" him, causing serious harm to his physical and mental health.

Demkovich sued the St. Andrew parish and the Archdio-cese of Chicago. The operative complaint asserts hostile envi-ronment claims under both Title VII and the Americans with Disabilities Act. The church moved to dismiss for failure to state a claim, invoking the ministerial employee exception. The district court granted the motion in part, dismissing the Title VII claim but allowing the ADA claim to proceed. *Dem-kovich v. St. Andrew the Apostle Parish*, 343 F. Supp. 3d 772, 789 (N.D. Ill. 2018).

This is an appeal under 28 U.S.C. § 1292(b). Defendants persuaded the district court to certify a broad legal question, not limited to the factual details of the particular case. See *Ahrenholz v. Board of Trustees of the Univ. of Illinois*, 219 F.3d 674, 677 (7th Cir. 2000). The district court certified the follow-ing question:

> Under Title VII and the Americans with Disabil-ities Act, does the ministerial exception ban all claims of a hostile work environment brought by a plaintiff who qualifies as a minister, even if the claim does not challenge a tangible employ-ment action?

A motions panel of this court agreed that the broad question was suitable for interlocutory appeal under § 1292(b), and an appeal under § 1292(b) brings up the whole certified order. *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 609 (7th Cir. 2000). Our review is de novo. See *Anicich*, 852 F.3d at 648.

II. *The Ministerial Exception and Hostile Environment Claims*

    A. *Origins and Purpose of the Ministerial Exception*

    To decide the question about extending the ministerial exception to hostile environment claims, we begin by looking to its origins and purpose. In 2012, consistent with decisions of every circuit, the Supreme Court recognized the ministerial exception in *Hosanna–Tabor*. See 565 U.S. at 188 n.2 (collecting cases). The Court affirmed summary judgment for the employer on the EEOC's claim that a ministerial employee was fired in retaliation after she asserted rights under the ADA.

    The ministerial exception is not a statutory interpretation. It is an application of the First Amendment: "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." 565 U.S. at 188. This kind of interference violates both the Free Exercise and Establishment Clauses of the First Amendment.

    First, "[b]y imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.* Second, "[a]ccording the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188–89.[2]

---

[2] The generic term "church" in *Hosanna–Tabor* and other ministerial exception cases extends of course to religious bodies of any faith. In this appeal, we attempt to restrict our use of the term "church" or "Church" to

This exception is not limited to religious discrimination claims. It extends to sex, race, national origin, age, disability, and now sexual orientation discrimination. *Hosanna–Tabor* also made clear that the exception applies whether or not the decision was grounded in religious doctrine. 565 U.S. at 194 ("The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason."). *Hosanna–Tabor* explained that the purpose of the ministerial exception is to "ensure[] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Id.* at 194–95, quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 119 (1952); accord, *Our Lady of Guadalupe School*, 140 S. Ct. at 2055.

The Court said in *Hosanna–Tabor* that it was not deciding the question we face here, whether the ministerial exception applies to suits that do not result from the firing of a ministerial employee: "The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." 565 U.S. at 196. Because Demkovich's amended complaint addresses only his treatment by his supervisor while he was employed and does not

refer specifically to defendants St. Andrew the Apostle Parish and the Archdiocese of Chicago, or the Catholic Church as a whole, as appropriate. We use "religious organization" and the like as our generic term.

challenge his firing, it falls into the area that *Hosanna–Tabor* declined to reach.

B. *Common Ground*

To focus our discussion of the disputed issue, it may be helpful to identify some important issues that are not disputed.

First, the parties agree that churches are not exempt from federal employment discrimination laws as applied to their non-ministerial employees. (Title VII includes an exception that allows religious employers to favor employment of people of a particular religion, but that exception is not relevant here. See 42 U.S.C. § 2000e-1(a).) As a general matter, it does not violate the First Amendment to apply federal employment discrimination laws to churches and other religious employers.

Second, the parties agree that Demkovich was a "ministerial employee" within the meaning of *Hosanna–Tabor* and *Our Lady of Guadalupe School*. *Hosanna–Tabor* recognized the category in the abstract, and the scope of the category was the principal issue in *Our Lady of Guadalupe School*. We and other courts have by now issued numerous opinions mapping the boundaries between ministerial employees and others in a host of religious communities and institutions. That issue is not disputed here.

Third, the certified question assumes that plaintiff has alleged viable hostile environment claims under both Title VII and the ADA, apart from the ministerial exception. We therefore do not dwell on the details of his factual allegations and whether they add up to sufficiently severe or pervasive hostility motivated by animus based on sex or disability.

Fourth, for purposes of this appeal, we also assume that plaintiff would be able to establish a basis for employer liability under Title VII and the ADA. As the interlocutory appeal has been framed, there is no issue concerning the church's liability for Reverend Dada's actions under *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), including their affirmative defense in cases not involving tangible employment actions for employers who can show they established channels for complaints and that the employee failed to take reasonable advantage of those channels.

Fifth, the parties treat Reverend Dada's alleged harassment of Demkovich as motivated by his and the Church's religious beliefs, if not actually required by those beliefs. This motivation is assumed for the alleged harassment based on both sexual orientation and disability.

## C. *The Dispute Over Hostile Environment Claims*

Against this background of points of agreement, we can focus on the disagreement here. As framed for this appeal, that disagreement is over the answer to a rather broad and abstract question of law: whether ministerial employee plaintiffs may *ever* bring hostile environment claims against religious employers. We do not address whether plaintiff Demkovich can prove that he suffered a hostile work environment. (That's a matter for trial or perhaps summary judgment.) Nor do we address, at this stage, whether some particular claims by some ministerial employees might pose insoluble problems of entanglement. The question as framed here is whether we can imagine any set of facts under which ministerial employees could bring hostile environment claims without running afoul of the Constitution. We can.

Religious organizations are not totally exempt from all legal claims by ministerial employees. Defendants here recognize that ministerial employees may be able to sue their employers and supervisors for at least some breaches of contract and for torts, including those committed in an employment relationship. Defendants also recognize that the criminal law may reach crimes committed in the employment relationship. Defendants argue that although the First Amendment does not categorically bar those sorts of claims, it does categorically bar all claims under federal discrimination statutes.

Plaintiff reminds us that he seeks only to apply a federal statute as written, so that any constitutional restriction must be justified as *necessary* to protect First Amendment liberties. Plaintiff argues that the proper line is between a ministerial employee's challenge to tangible employment actions (hiring, firing, job assignment, compensation, and the like), which is not permitted, and a challenge to a discriminatorily hostile environment based on race, sex, age, national origin, or disability. Plaintiff argues that a religious employer's ability to take tangible employment actions free of statutory liability gives the employer ample freedom to "select and control" its ministerial employees. The First Amendment does not require, says plaintiff, additional protection in the form of complete immunity from hostile environment claims.

D. *Circuit Court Decisions*

The Supreme Court has not answered the question we face here. Defendants and the dissenting opinion argue that we have already decided this question in *Alicea–Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003). We wrote there: "The 'ministerial exception' applies without re-

gard to the type of claims being brought." Defendants interpret this sentence to bar all claims, including hostile environment claims, by a ministerial employee. That reading takes the sentence out of context and reads it too broadly.

Alicea–Hernandez worked for the Archdiocese of Chicago as Hispanic Communications Manager, but she resigned after a year. She sued for sex and national origin discrimination, alleging "poor office conditions," exclusion from key meetings, denial of resources and training she needed to do her job, and constructive discharge. 320 F.3d at 700. She was pro se when she filed her complaint, though she had counsel by the time her case came to our court. See *id.* at 702. She did not clearly delineate her claims by reference to causes of action for wrongful termination and/or a hostile work environment. Nor did our opinion, which did not mention any hostile environment claim. Our description of her claims in the opinion indicated that she was challenging tangible employment actions such as denial of training and resources, exclusion from meetings, and discharge. See, e.g., *Lewis v. City of Chicago*, 496 F.3d 645, 653–54 (7th Cir. 2007) (denial of training could be adverse employment action); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 932–33 (7th Cir. 1996) (exclusion from meetings of supervisors could be adverse employment action). The question before us today simply was not presented in *Alicea–Hernandez*.[3]

---

[3] Contrary to the dissenting opinion, Alicea–Hernandez's allegations of emotional distress and humiliation did not signal claims for a hostile work environment. Unlawful discrimination in tangible employment decisions—firings, denials of promotion, and the like—often causes humiliation and emotional distress. These are well-recognized elements of damages in such cases. See, e.g., *Merriweather v. Family Dollar Stores of Indiana,*

The limits of the *Alicea–Hernandez* language are also clear when it is read in context. Defendants' quotation appeared in our rejection of plaintiff's argument that the court should try to distinguish between actions taken with secular motives and those with religious motives:

> The question for us to answer therefore is whether Alicea–Hernandez's position as Hispanic Communications Manager can functionally be classified as ministerial. Alicea–Hernandez suggests that we also need to look to the nature of her claims and whether the discrimination in question was exclusively secular. Here she is mistaken. *The "ministerial exception" applies without regard to the type of claims being brought.* This was explained by the Fourth Circuit in *EEOC v. Roman Catholic Diocese*:
>
> > [T]he ministerial exception to Title VII is robust where it applies. …

---

*Inc.*, 103 F.3d 576, 580–81 (7th Cir. 1996); *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227–29 (7th Cir. 1995); Federal Civil Jury Instructions of the Seventh Circuit § 3.10 (2015).

In addition, the dissenting opinion points out that Alicea–Hernandez used the phrase "hostile environment" at several places in her appellate brief. Post at 37. A closer look shows, however, that she was complaining about unequal treatment in terms of resources (no computer, poor furniture), limited training opportunities, and similar tangible conditions of employment. Her brief did not articulate an otherwise viable theory of hostile environment liability. See Brief of Plaintiff-Appellant, *Alicea–Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003) (No. 02-2280), 2002 WL 32172619.

> The exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision. *The church need not, for example, proffer any religious justification* for its decision, for the Free Exercise Clause "protects the *act of a decision* rather than a motivation behind it."

213 F.3d at 802 (quoting *Rayburn* [*v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (7th Cir. 1985)]). To rule otherwise would enmesh the court in endless inquiries as to *whether each discriminatory act was based in Church doctrine or simply secular animus*. The Fifth Circuit has provided the following rationale for this rule:

> [A]n investigation and review of such matters of church administration and government as a minister's salary, his place of assignment and his duty, which involve a person at the heart of any religious organization, could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment.

*McClure* [*v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972)].

> It is therefore *not our role to determine whether the*
> *Church had a secular or religious reason* for the al-
> leged mistreatment of Alicea–Hernandez. The
> only question is that of the appropriate charac-
> terization of her position.

320 F.3d at 703 (emphases added).

In context, the sentence defendants rely upon was aimed at challenges to tangible employment actions. It was not addressing the difference between tangible employment actions and hostile environments. It was instead rejecting the argument that discriminatory tangible employment actions with secular motives against a minister should be actionable. Our holding on this point in *Alicea–Hernandez* anticipated the Supreme Court's holding in *Hosanna–Tabor*: religious organizations may hire or fire ministerial employees for *any* reason, religious or secular. 565 U.S. at 194–95. The quoted sentence remains sound in context, but we did not embed in that sentence an implied decision to create a split with the Ninth Circuit on the issue we face here.

Before *Alicea–Hernandez*, the Ninth Circuit had drawn a line between tangible employment actions and hostile environment claims. In *Bollard v. California Province of Society of Jesus*, 196 F.3d 940 (9th Cir. 1999), plaintiff had been training for the priesthood. He alleged that his superiors subjected him to sexual harassment so severe that he left the Jesuit order before taking vows as a priest. The district court dismissed under the then-emerging ministerial exception. See *id.* at 944.

The Ninth Circuit reversed, emphasizing that the case did not present any challenge to "the Jesuit order's choice of rep-

resentative, a decision to which we would simply defer without further inquiry." *Id.* at 947. The Jesuits also did not defend the alleged harassment as motivated by religious faith; the Jesuits condemned it.

The Ninth Circuit found that the Free Exercise Clause did not require the courts to deny relief:

> The Free Exercise Clause rationale for protecting a church's personnel decisions concerning its ministers is the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant. That rationale does not apply here, for the Jesuits most certainly do not claim that allowing harassment to continue unrectified is a method of choosing their clergy. Because there is no protected-choice rationale at issue, we intrude no further on church autonomy in allowing this case to proceed than we do, for example, in allowing parishioners' civil suits against a church for the negligent supervision of ministers who have subjected them to inappropriate sexual behavior.

196 F.3d at 947–48. A "generalized and diffuse concern" about church autonomy was not enough to require dismissal. *Id.* at 948.

*Bollard* went on to consider the problem of entanglement under the Establishment Clause. The court found there would be no need to evaluate religious doctrine or the "reasonableness" of Jesuit practices. *Id.* at 950. Finding there would be no greater entanglement than in other private civil suits against

a church, the Ninth Circuit found no constitutional barrier to the sexual harassment claim that did not challenge any tangible employment action.

The Ninth Circuit followed that same course in *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004), and drew essentially the same line we draw here. The plaintiff was an ordained minister who alleged that a senior minister sexually harassed her and retaliated against her. The district court dismissed. Following *Bollard*, the Ninth Circuit held that the plaintiff could not challenge any tangible employment decisions but that she could pursue her hostile environment claims, including damages for emotional distress and reputational harm. *Id*. at 953.[4]

The Tenth Circuit took a different approach in *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010), where the plaintiff was a ministerial employee and sued for sex discrimination, including both tangible employment actions and a sexually hostile environment. The Tenth Circuit affirmed dismissal of all claims, reasoning that even

---

[4] The Ninth Circuit did not depart from *Bollard* and *Elvig* in *Werft v. Desert Southwest Annual Conf. of United Methodist Church*, 377 F.3d 1099 (9th Cir. 2004). The plaintiff there was a minister who sued for failure to accommodate his disabilities. To avoid the ministerial exception, he tried to invoke *Bollard* by casting his claim in terms of a hostile environment. The Ninth Circuit rejected that attempt, correctly treating the claim for failure to accommodate as one challenging tangible employment actions, thus distinguishing *Bollard* and *Elvig*. See 377 F.3d at 1103–04. The Ninth Circuit's decisions are thus consistent with each other. The dissenting opinion treats *Werft* as having created an intracircuit split without saying so.

the hostile environment claim would pose too great a threat of entanglement with religious matters. *Id.* at 1245.[5]

E. *Tangible Employment Actions, Hostile Environments, and the Free Exercise Clause*

The ministerial exception is a matter of constitutional law, not statute. *Our Lady of Guadalupe School*, 140 S. Ct. at 2055; *Hosanna–Tabor*, 565 U.S. at 188. The question here is not whether we believe as a matter of policy that religious employers should be exempt from hostile environment claims. The question is whether that exemption is *necessary* under the First Amendment. *Bollard*, 196 F.3d at 947. In terms of the Free Exercise Clause, the answer is no.

The ministerial exception ensures that religious organizations are able to "select and control" their ministers without interference from civil law like employment discrimination statutes and their procedures for enforcement. *Hosanna–Tabor*, 565 U.S. at 195; accord, *Our Lady of Guadalupe School*, 140 S. Ct. at 2060–61. That purpose can be accomplished by applying the ministerial exception to all tangible employment actions, which give religious employers ample tools to both select and control their ministerial employees.

Selection is clear enough. Hiring, firing, promoting, retiring, transferring—these are decisions that employers, including religious organizations, make to select those who carry

---

[5] The Tenth Circuit said it was following our decision in *Alicea–Hernandez*, quoting the same sentence defendants emphasize here, to the effect that "the ministerial exception applies without regard to the type of claims being brought." *Skrzypczak*, 611 F.3d at 1245, quoting *Alicea–Hernandez*, 320 F.3d at 703. As explained above, we do not read *Alicea–Hernandez* so broadly.

out their work. Further control is available through a host of other tangible employment actions, including decisions about compensation and benefits, working conditions, resources available to do the job, training, support from other staff and volunteers … the list could go on.

Employment discrimination law recognizes an employer's power to control work of its employees in these many ways. That's why employers are held accountable for these tangible decisions when a manager makes such a decision with an unlawful purpose. See *Ellerth*, 524 U.S. at 762 ("Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates" and require "an official act of the enterprise").

Hostile environment claims arise under the same statutes, but they involve different elements and specially tailored rules for employer liability. These differences show that a religious employer does not need exemption from such claims to be able to "select and control" its ministers.

Hostile environment claims are essentially tortious in nature. See *Ellerth*, 524 U.S. at 756–57; *Faragher*, 524 U.S. at 793–94. They use different standards for holding an employer liable for actions that render the environment hostile, and they do so precisely because the behavior that creates the hostile environment is *not* essential for management supervision and control of employees.

That different character of hostile environment claims began to emerge in the early cases. See, e.g., *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986) (collecting cases on hostile environments). In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), the Supreme Court developed the definition of

an actionable hostile work environment: "When the work-place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id*. at 21, quoting *Meritor Savings Bank*, 477 U.S. at 65, 67 (quotation marks omitted). This is a demanding standard; a plaintiff's evidence must go well beyond showing rudeness or incivility, *Faragher*, 524 U.S. at 788 (standards are "sufficiently demanding to ensure that Title VII does not become a 'general civility code'"); *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017), even if it need not reach the point of "hellishness." See *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).[6]

The lack of constitutional necessity for barring ministerial employees' hostile environment claims becomes clear from the tort-law origins of the claims and the basis for employer liability for them, as explained in *Ellerth* and *Faragher.* In those decisions, the Court used the line between tangible employment actions and hostile environments to set different standards for employer liability.[7]

---

[6] For statements of the elements of a viable hostile environment claim, see, e.g., *Johnson*, 892 F.3d at 900; *Passananti v. Cook County*, 689 F.3d 655, 667 (7th Cir. 2012).

[7] The dissenting opinion asserts that courts will not be able to distinguish between tangible employment actions and other wrongs. Post at 38. In fact, federal courts have been applying that line for decades. That line controls whether an employer may invoke the affirmative defense in *Faragher* and *Ellerth*. See *Ellerth*, 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *id*. at 763; see also Federal Civil Jury Instructions of the Seventh Circuit

In general, "sexual harassment by a supervisor is not conduct within the scope of employment," so the employer cannot be held liable for that conduct. *Ellerth*, 524 U.S. at 757. However, "an employer can be liable, nonetheless, where its own negligence is a cause of the harassment," *id.* at 759, or where the supervisor takes tangible employment action against the employee. *Id.* at 760–61; accord, *Faragher*, 524 U.S. at 789–90. If no tangible employment action is taken, these rules treat harassment as a tort committed by a supervisor against an employee but acting outside the scope of the supervisor's employment.

Defendants here argue that their power as employers to take tangible employment actions against ministerial employees does not give them enough power to "select and control" those employees. But *Harris* teaches that a hostile work environment simply is not a permissible means of exerting (constitutionally protected) "control" over employees and accomplishing the mission of the business or religious organization. 510 U.S. at 23.

The ministerial exception gives religious organizations the power to use the full range of tangible employment actions to select and control their ministerial employees without judicial review or government interference under these federal statutes. These employers are thus able to control their employees in every way that would be necessary to exercise their religious freedoms. It is hard to see how the Church could not have adequately controlled plaintiff as a ministerial employee by deciding whether to hire him and whether to fire him, or

---

§§ 3.05A & 3.05B (different instructions depending on whether claim is based on tangible employment action).

by deciding his job duties, his place of work, his work schedule, his compensation, the resources he needed to work, and so forth.

Subjecting plaintiff to the abuse alleged here is neither a statutorily permissible nor constitutionally protected means of "control" within the meaning of *Hosanna–Tabor*. *Hosanna–Tabor* made clear that its holding does not cover "actions by employees alleging … tortious conduct by their religious employers." 565 U.S. at 196. The conduct plaintiff alleges here is classic tortious harassment under *Meritor Savings Bank, Harris, Ellerth, Faragher*, and countless other cases: his supervisor allegedly subjected him to a campaign of verbal abuse based on his sex, sexual orientation, and disabilities, ultimately interfering with his job performance and mental and physical health.

An employer's need and right to control employees should not and does not embrace harassing behavior that the Supreme Court has defined in numerous cases in terms of what "unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The notion that such harassment is necessary to control or supervise an employee is, under employment discrimination law, an oxymoron. We presume an employer is interested in maximizing the employee's ability to perform his or her stated duties to further the organization's objectives, not in permitting a supervisor to "control" the employee through abuse that actively inhibits job performance and is beyond the scope of that supervisor's own employment.[8]

---

[8] The dissenting opinion suggests that the line between tangible employment actions and hostile environments creates "a perverse incentive"

The defendants have asserted at various times that Reverend Dada's conduct was motivated by Catholic doctrine. That conduct can lawfully be imputed to the Catholic Church as an employer only if the Church embraced that conduct as its own employment policy through constructive or actual knowledge and failure to act. (Consider, for example, a case of similar harassment aimed at a non-ministerial employee, where such harassment would certainly be unlawful despite its religious motive.) *Hosanna–Tabor*'s decision not to extend constitutional protection to tortious conduct, in combination with the Court's understanding of hostile work environments as essentially tortious in nature, point toward allowing hostile work environment claims by ministerial employees so long as they do not challenge tangible employment actions.

*Hosanna–Tabor* protects the rights of religious *employers*, not supervisors within those religious organizations. That feature of the ministerial exception lends further support to our conclusion. The opinion speaks of "religious organizations" and "churches," considering the rights of those entities as employers. Because tangible employment actions are directly attributable to employers, holding that those claims are off-limits to ministerial employees fits with *Hosanna–Tabor*'s focus on the institutional rights of employers.

Hostile environment claims are quite different. They concern the behavior of individual co-workers and/or supervisors that is generally treated as outside the scope of employment. Such behavior may be attributable to the employer in

by encouraging employers to create an environment so hostile as to cause a constructive discharge. Post at 39. We disagree. An employer who wants to remove a ministerial employee may simply fire him, as defendants eventually fired plaintiff here.

case of employer negligence or abuse of power over tangible
employment actions, such as decisions to fire, demote, etc.,
which are off limits with ministerial employees. Supervisors
within religious organizations have no constitutionally pro-
tected individual rights under *Hosanna–Tabor* to abuse those
employees they manage, whether or not they are motivated
by their personal religious beliefs. We do not address here the
genuineness or substance of Reverend Dada's religious moti-
vations for his actions toward Demkovich. We note only that
*Hosanna–Tabor* grants him, personally, no special protection to
express his religious beliefs beyond that generally provided
by the Free Exercise Clause.

### F.  *Consequences*

The defendants and the dissenting opinion advocate cate-
gorically barring ministerial employees from bringing *any*
hostile work environment claim. With respect, this argument
reaches too far. We can agree with the dissent's general state-
ments about religious liberty and the importance of the min-
isterial exception, at least in cases challenging the selection
and control of ministers. These statements about religious lib-
erty are not the whole story, however. We must also account
for the limits of *Hosanna–Tabor* and the reality that civil courts
may hear and decide a range of other cases involving minis-
ters and religious employers without violating the First
Amendment.

The defendants draw conclusions that depart from the or-
igins and purpose of the ministerial exception, and from the
careful balancing that courts use in these delicate encounters
between civil law and faith. In answering the abstract ques-
tion whether hostile work environment claims should ever be
available to ministerial employees, we must consider the full

range of facts that might prompt such employees to bring such claims.

Within this circuit alone, such claims have been brought on the basis of highly disturbing facts. For example, in *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040 (7th Cir. 2002), plaintiff Cerros, who is Hispanic, was subjected to horrific racial harassment stemming from his supervisors' explicit embrace of the philosophy "if it ain't white it ain't right." Co-workers and supervisors harassed him with derogatory terms for Hispanic people and painted racist graffiti on bathroom walls, including "KKK" and "White Power." Cerros's tires were slashed in the company parking lot. Despite Cerros's repeated complaints, the company never investigated or took any remedial action. *Id.* at 1042–43.

In *Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d. 1002 (S.D. Ind. 2004), plaintiff was the only Black employee of a concrete company. He was subjected to racist jokes from the start of his employment, but that was only the beginning of the campaign of racist terror he suffered. Henderson's work uniform and truck were repeatedly vandalized. A co-worker repeatedly insinuated that he belonged to the Ku Klux Klan; when Henderson asked the co-worker directly whether he had previously been in the KKK, their common supervisor corrected Henderson, saying that the co-worker was still a KKK member. The KKK member told Henderson and another employee, again in a supervisor's presence, that he'd like to "drag [Henderson] … down the street on the back of my pickup truck," and then tried to lure him outside. Another employee twice tried to hit Henderson with a truck in the company parking lot. The company had done nothing to stop the harassment and terrorizing. *Id.* at 1006–08.

In *Porter v. Erie Foods International, Inc.*, 576 F.3d 629, 635 (7th Cir. 2009), a Black employee repeatedly had a noose left at his work station and suffered violent intimidation in the workplace. In *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989), a supervisor repeatedly showed racist pornography to an employee, threatened to force her to engage in bestiality, and threatened to kill her. In *EEOC v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 428–30, 432 (7th Cir. 2012), a restaurant manager sexually harassed and assaulted multiple teenage employees, one during every single shift they worked together. See also *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 749–50 (7th Cir. 2018) (plaintiff was subjected to four years of groping, mimed sex acts, and racial slurs; he was threatened with meat cleavers and his tires were slashed after he reported workplace abuse to a supervisor); *Gates v. Board of Education*, 916 F.3d 631, 637–39 (7th Cir. 2019) (plaintiff was subjected to repeated use of vicious racial epithets; collecting a number of other cases in which racial and sex-based abuse constituted a hostile work environment). We could go on.

In their briefing and at oral argument in this case, defendants acknowledged that a religious employer could be held civilly liable for a supervisor's criminal or tortious conduct toward a ministerial employee, or for the pattern of racial abuse and harassment described in *Porter*. Such cases would not seem, then, to violate the supervisor's or the employer's constitutional rights of free exercise of religion. If criminal or tort cases do not, then it is hard to see why a statutory case based on the same conduct would *necessarily* violate the First Amendment, whether or not the supervisor claims a religious motive. See, e.g., *Bollard*, 196 F.3d 940; *Elvig*, 375 F.3d 951.

Keeping in mind that the ministerial exception is driven by constitutional necessity, see *Hosanna–Tabor*, 565 U.S. at 188; *Bollard*, 196 F.3d at 947, we conclude that the First Amendment does not require that supervisors and co-workers of ministerial employees have the right, for example, to leave nooses at the desk of a Black minister while repeatedly subjecting him to verbal abuse with racial epithets and symbols, or to subject a teacher to pervasive and unwelcome sexual attention, or to subject another to intimidating harassment based on national origin. Such harassment is not constitutionally necessary to "control" ministerial employees. We hope that such extreme allegations against religious organizations would be very rare. In answering the broad question defendants present here, however, we must keep in mind the wide range of religious organizations and the broad sweep of the rule defendants advocate.

G.  *The Establishment Clause and Entanglement*

Having concluded that hostile environment cases by ministerial employees do not categorically violate the Free Exercise Clause, we turn to the Establishment Clause aspects of the issue. Cases addressing the ministerial exception raise the concern that litigation of particular types of claims against religious organizations will excessively entangle them with the government. E.g., *Bollard*, 196 F.3d at 948–49; *Elvig*, 375 F.3d at 956–57; see generally *Agostini v. Felton*, 521 U.S. 203, 233 (1997) ("Interaction between church and state is inevitable, … . Entanglement must be 'excessive' before it runs afoul of the Establishment Clause."); *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1007 (7th Cir. 2019) (general rule is that, to constitute ex-

cessive entanglement, government action must involve intrusive government participation in, supervision of, or inquiry into religious affairs).

The cases speak of both procedural and substantive entanglement. Defendants argue both are inevitable here. We are not persuaded that excessive entanglement is so inevitable that no plaintiff should be permitted to try to prove a case of hostile environment. Courts have relatively little experience with such cases against religious employers. Perhaps defendants' predictions of intolerable abuses and intrusions may come true. At this time, however, we are not persuaded that courts cannot manage a balance that respects the rights of both churches and their employees.

Procedural entanglement "might … result from a protracted legal process pitting church and state as adversaries," in which the religious organization would be subjected to "the full panoply of legal process designed to probe the mind of the church," including "far-reaching" remedies and "continued court surveillance of the church's policies and decisions" even after final judgment. *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (7th Cir. 1985). Substantive entanglement occurs "where the Government is placed in a position of choosing among competing religious visions." *EEOC v. Catholic University of America*, 83 F.3d 455, 465 (D.C. Cir. 1996) (quotation marks omitted). We consider first procedural and then substantive entanglement.

### 1. *Procedural Entanglement?*

The potential for procedural entanglement does not justify a categorical rule against all hostile environment claims by ministerial employees. The defense arguments on procedural

entanglement face a major obstacle in the fact that religious employers have long been subject to employment discrimination suits by their non-ministerial employees. We know that the processes of civil litigation can be intrusive. No employer welcomes them. But civil litigation of such claims against religious employers has not been deemed a sufficient basis to require dismissal. Procedural entanglement is not necessarily any more a concern with hostile environment claims by ministerial employees than with claims by non-ministerial employees.

On the subject of procedural entanglement, we find helpful guidance from *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986). A state civil rights commission started to investigate allegations that a religious school discriminated against a teacher because of her sex. As in *Hosanna–Tabor*, that teacher had agreed in her contract to resolve disputes within the church itself. The school ultimately fired her for complaining to the state government to start a civil investigation, contrary to this commitment. *Id.* at 623.

The school sought a federal injunction against the state investigation based on what we would now call entanglement, arguing "that any investigation of [the school's] hiring process or any imposition of sanctions for [its] nonrenewal or termination decisions would violate the Religion Clauses of the First Amendment." *Id.* at 624–25. The Supreme Court rejected the claim, holding that the district court should have abstained from exercising jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. *Dayton Christian Schools*, 477 U.S. at 625.

Noting that "[e]ven religious schools cannot claim to be wholly free from some state regulation," the Court had "no doubt that the elimination of prohibited sex discrimination is a sufficiently important state interest" to justify *Younger* abstention and also had "no reason to doubt that [the school] will receive an adequate opportunity to raise its constitutional claims" in state proceedings. *Id.* at 628. The Court gave no weight to the argument that church disputes were to be resolved internally, according to its own doctrine. *Dayton Christian Schools* signals that an investigation of such an allegation of discrimination does not threaten unconstitutional entanglement to the extent that the investigation must be shut down as it begins.

That result is consistent with a broader landscape of litigation in civil courts involving churches. The Catholic Church has itself faced extensive litigation over torts committed by clergy in recent years, involving, for example, factual inquiries into the relationships between clergy and parishioners and into the internal disciplinary practices of the Church in the context of allegations of sexual abuse of children. Constitutional arguments do not foreclose such litigation. See, e.g., *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 430–32 (2d Cir. 1999); *Malicki v. Doe*, 814 So. 2d 347, 351–57 & n.2 (Fla. 2002) (collecting cases); see also *Elvig*, 375 F.3d at 959 (allowing a minister's hostile work environment claim to go forward where allegations would involve only "a purely secular inquiry" and would not require court to pass on issues of religious doctrine).

Given the scope of the ministerial exception and the lack of any generalized immunity from litigation for religious organizations, the potential for procedural entanglement does

not bar plaintiff's claims here entirely. Courts can deal with procedural entanglement problems as they arise rather than closing the courthouse doors to an entire category of cases.

### 2. *Substantive Entanglement?*

The more difficult problems arise here in terms of potential substantive entanglement. These are variations on a set of problems that courts have managed in litigation involving religious organizations across a range of subject matters, from contracts and property disputes to employment disputes, torts, and church elections and schisms.

The general parameters are familiar. A civil court should not try to decide questions of correct faith and practice, such as deciding which of two rival groups seeking control of church property has the better theological or doctrinal arguments. At the same time, civil courts sometimes must decide questions of property, contract, tax, or tort law in cases involving churches. They may do so if they avoid issues of faith and stick to applying neutral, secular principles of law. E.g., *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 695–700 (1989) (denying charitable deductions where quid pro quo exchange for services was clear); *Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 305 (1985) (permitting application of Fair Labor Standards Act to religious employer); *Bob Jones University v. United States*, 461 U.S. 574 (1983) (affirming denial of university's tax-exempt status based on racial discrimination said to be based on religious doctrine); *Jones v. Wolf*, 443 U.S. 595, 602–04 (1979) (resolving property dispute between rival factions of local church); *NLRB v. Catholic Bishop*, 440 U.S. 490, 503 (1979) (interpreting statute to deny NLRB jurisdiction over lay teachers in church

schools); *Serbian Eastern Orthodox Diocese for the U.S.A. v. Milivojevich*, 426 U.S. 696, 708–09 (1976) (reversing state court decision that set aside decisions of "mother church" defrocking bishop, dividing diocese, and amending diocese constitutions); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969) (reversing state court decision in property dispute that had been based on court's assessment of church doctrine); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 120–21 (1952) (striking down state statute transferring administrative control from Russian hierarchy to leader of United States branch).

Applied to this case, federal courts would have no business telling the Catholic Church what it should teach about same-sex marriage any more than about the doctrine of the Trinity or the relationship between faith and works. That easy answer does not answer the question before us, however.

Defendants argue that Reverend Dada's behavior toward Demkovich's sexual orientation was motivated by church doctrine *and* that the manner in which he expressed or implemented this doctrine should be shielded from judicial scrutiny. Defendants also contend that Reverend Dada's supervision of Demkovich authorized him to harangue Demkovich about his health: "Such comments would be viewed not as harassment, but as the proper formation of a member of the clergy." The defendants' embrace of the alleged harassment could distinguish this case from those before the Ninth Circuit, in which the defendant churches disavowed the alleged harassment. See *Bollard*, 196 F.3d at 947; *Elvig*, 375 F.3d at 959. The district court accepted this argument in part, dismissing

Demkovich's sexual orientation claim but allowing his disability claim to go forward because the Archdiocese offered a Catholic doctrinal ground for the former but not the latter. See *Demkovich*, 343 F. Supp. 3d at 786, 788.

We are not persuaded that the risk of substantive entanglement is so great that this case or all such cases must be dismissed without further inquiry or discovery. To violate the Establishment Clause, entanglement must be "excessive." *Agostini*, 521 U.S. at 233. Plaintiff is not asking the court to pass on the substance of the Catholic Church's religious doctrines or practices. Civil courts have nothing to say about whether the Church should permit same-sex marriage, for example, or whether the Church should have a hierarchical supervisory structure. The Church was free to decide whether to retain plaintiff as a minister or fire him. The government may not interfere with that decision. But plaintiff's hostile work environment claims assert that some of those internal Church decisions caused behavior that constituted abuse under neutral, generally applicable standards that would be enforceable on behalf of a non-ministerial employee, and could also be enforced in a hostile environment case by a ministerial employee. As in cases applying secular legal rules to torts, contracts, or property disputes, courts may apply secular hostile environment jurisprudence to actions taken toward employees.

We also find guidance from the line of Supreme Court cases involving the limits of free exercise of religion. The Supreme Court has long held that civil courts may and sometimes must draw lines at times around the ways in which religious beliefs are expressed. Reverend Dada could have chosen to express Church doctrine on same-sex marriage, or to

exercise his supervisory powers, in non-abusive ways that would not add up to a hostile environment. Or consider the more extreme abuse we summarized above that would be in-sulated within religious organizations if we were to find that unconstitutional entanglement is inevitable, as defendants and the dissenting opinion argue.

"We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law pro-hibiting conduct that the State is free to regulate." *Employment Division v. Smith*, 494 U.S. 872, 878–79 (1990). Though aspects of *Smith* have been superseded by statute, government regu-lation of the outward expression of religious belief, where that regulation is not intended to target or dampen particular reli-gious practices per se, remains generally permissible, though subject to a careful weighing of First Amendment freedoms against the governmental interest in that particular regula-tion. See *Watson v. Jones*, 80 U.S. 679, 714 (1871) ("Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints."); *United States v. Lee*, 455 U.S. 252, 260–61 (1982) (employer's religious objections did not excuse payment of social security taxes); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993) (truly neutral and generally applicable laws may be enforced against churches and their practices); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 439 (2006) ("Congress has determined that courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue;" plaintiff religious organization won because the Government

failed to carry its burden, not because regulation was inherently inapplicable to religious organizations).

Taking these lines of analysis together, we base our decision on three points. First, the Free Exercise Clause does not bar all hostile environment claims by ministerial employees. Second, the risk of procedural entanglement in such cases is modest because religious organizations have no generalized claim to immunity from litigation or regulation. Third, in hostile environment cases brought by ministerial employees, there is some risk of substantive entanglement, but that risk does not appear so severe that all such claims must be dismissed. We believe that risk can be managed by avoiding substantive decisions on issues of religious doctrine or belief and by balancing First Amendment rights with the employee's rights and the government's interest in regulating employment discrimination. We trust that district courts will manage these issues in their sound discretion. It is, of course, conceivable that certain cases may unavoidably present factual questions that would entangle courts excessively in substantive religious decision-making. District judges can narrow or dismiss such cases if they arise. But the possibility of some outlier cases does not persuade us that the First Amendment requires courts to bar an entire category of claims authorized by federal statute.

The defendants and the dissenting opinion predict that cases like this will inevitably and gravely violate the First Amendment rights of religious institutions. Post at 43–44. We take that possibility seriously, but the First Amendment is not the only source of law and values that we must consider here. Hostile environment claims by ministerial employees have

been few and far between. The federal courts have little experience with them. We believe it would be a mistake, and at least very premature at this time, to conclude that all such cases will inevitably violate the First Amendment and thus must be barred.

*  *  *  *  *

We answer the certified question in the NEGATIVE. Accordingly, we AFFIRM the decision of the district court denying dismissal of the disability claim, and REVERSE its decision dismissing the sexual orientation claim. The case is REMANDED for further proceedings consistent with this opinion.

FLAUM, *Circuit Judge*, dissenting. In my judgment, controlling precedent requires dismissal of Demkovich's claims. In *Alicea–Hernandez v. Catholic Bishop of Chicago*, we held that the ministerial exception barred all of the plaintiff's employment discrimination claims, including her hostile work environment claim. 320 F.3d 698, 702–04 (7th Cir. 2003). I would follow that holding here. The Church's First Amendment right to select and control its ministers includes the ability to supervise, manage, and communicate with them free from government interference. Adjudicating Demkovich's hostile work environment claims will unavoidably and excessively entangle the courts in religious matters at the core of the protected ministerial employment relationship. Accordingly, I respectfully dissent.

## I. *Alicea–Hernandez*

My colleagues' holding rests on their view that the plaintiff in *Alicea–Hernandez* did not assert a hostile work environment claim. But the complaint in *Alicea–Hernandez* alleged both tangible employment action and an "intangible" hostile work environment:

> I was subjected to prolonged humiliation and emotional stress of working under unequal and unfair conditions of employment; was excluded from management meetings, training and information required for me to perform my duties; was ordered evicted from the premises and replaced by a male Hispanic with less competence and experience in Hispanic communication.

*Id.* at 702. By alleging "prolonged humiliation and emotional stress of working under unequal and unfair conditions of employment," the plaintiff asserted a hostile work environment claim. Those allegations largely track the legal standard for hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (stating that a hostile work environment claim exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment") (citation and internal quotation marks omitted); *see also Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (stating that whether allegedly discriminatory conduct establishes a hostile work environment depends in part on whether the conduct was "humiliating").

Indeed, in appellate briefing, Alicea–Hernandez repeatedly described her claim as a hostile work environment claim. *See Alicea–Hernandez*, 320 F.3d 698, Br. of Plaintiff-Appellant Gloria Alicea–Hernandez, 2002 WL 32172619, at **4, 9, 12, 14, 16 & 20. What is more, my colleagues acknowledge that Alicea–Hernandez asserted a constructive discharge claim. The "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004). Hence, my colleagues must recognize that by dismissing Alicea–Hernandez's constructive discharge claim, we also dismissed her "necessary predicate" hostile work environment claim.

Accepting that Alicea–Hernandez asserted a hostile work environment claim, I conclude that the majority has not convincingly addressed why we should resolve this case any

differently. We stated in *Alicea–Hernandez* that "[t]he 'ministerial exception' applies without regard to the type of [employment discrimination] claims being bought." 320 F.3d at 703. My colleagues interpret that statement in context to mean only that the ministerial exception applies without regard to whether the employer asserts a religious justification for the alleged discrimination. But even if my colleagues' narrow interpretation of that statement were correct, that does not confront *Alicea–Hernandez*'s substantive holding, which required the dismissal of the plaintiff's employment discrimination claims—including the hostile work environment claim—under the ministerial exception.

The majority's treatment of *Alicea–Hernandez* illustrates the unworkable task they thrust upon district courts. Despite Alicea–Hernandez's own representations, the majority re-characterizes her claim as "indicat[ing] that she was challenging tangible employment actions" rather than a hostile work environment. But the majority provides only indeterminate lists of what constitutes a tangible employment action: "hiring, firing, promoting, deciding compensation, job assignments, and the like" as well as "decisions about compensation and benefits, about working conditions, resources available to do the job, training, support from other staff and volunteers … the list could go on." Beyond the indeterminacy of these lists, the majority does not address how allegations of intangible employment actions might indicate that the plaintiff has challenged the actions on the lists such that a district court must dismiss the minister's entire employment discrimination claim, as we did in *Alicea–Hernandez*.

To the extent the majority opinion is reconcilable with *Alicea–Hernandez*, I suggest the resulting rule creates a

perverse incentive for religious employers. Under the majority's rule, if a minister alleges that her work environment was hostile without indicating that she is challenging a tangible employment action, then the ministerial exception does not protect the religious employer. But if the religious work environment becomes so intolerable that it prompts a constructive discharge, as in *Alicea–Hernandez*, then the ministerial exception *does* protect the religious employer.

Perhaps a minister could plead around the majority's rule by being careful to avoid challenging a tangible employment action. However, there is no principled reason to allow such artful pleading, and the majority does not offer much guidance for religious employers, ministers, or courts to know what allegations of intangible employment actions indicate that the minister is instead challenging a tangible one.

Based in part on *Alicea–Hernandez*, the Tenth Circuit has held that the ministerial exception bars hostile work environment claims. *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010). My colleagues rely heavily on two Ninth Circuit cases holding that the ministerial exception does not categorically bar ministers' hostile work environment claims where the religious employer denies or disavows the conduct. *See Elvig v. Calvin Pesbyterian Church*, 375 F.3d 951, 963 (9th Cir. 2004); *see also Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999). But in *Werft v. Desert Southwest Annual Conference of United Methodist Church*, the Ninth Circuit subsequently affirmed the dismissal of a hostile work environment claim under the ministerial exception because the claim was "a part of the employment relationship between church and minister." 377 F.3d 1099, 1103–

04 (9th Cir. 2004) (per curiam). Here, as in *Werft*, the hostile work environment claims are a part of the ministerial employment relationship.

Although my colleagues characterize the claim at issue in *Werft* as alleging tangible employment action, I find nothing in that opinion to suggest that the Ninth Circuit rejected the plaintiff's characterization of his claim as a hostile work environment claim. Rather, the Ninth Circuit explained that "[t]he ministerial exception does not apply solely to the hiring and firing of ministers, but also relates to the broader relationship between an organized religious institution and its clergy, termed the 'lifeblood' of the religious institution." *Werft*, 377 F.3d at 1103 (quoting *McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972), and emphasizing that matters "*touching*" the ministerial employment relationship are protected). Indeed, it is the kind of parsing and recharacterizing of claims that the majority advances that has led the Tenth Circuit to conclude that a categorical approach "provides greater clarity in the exception's application and avoids the kind of arbitrary and confusing application the Ninth Circuit's approach has created." *Skrzypczak*, 611 F.3d at 1245. As discussed above, however, I suggest one need look no further than our own precedent to decide this appeal.

## II. Protected Ministerial Employment Relationship

There are good reasons to follow our holding in *Alicea–Hernandez* that the ministerial exception bars employment discrimination claims without regard to the type of claim. As the Supreme Court recently explained, the "First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church govern-

ment as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). A "church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

Rooted in the religion clauses of the First Amendment, the ministerial exception therefore "precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna–Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012) (collecting cases); *see also, e.g.*, *E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 461 (D.C. Cir. 1996) (stating that the ministerial exception "precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them"). A church must "not be constrained in its dealings with [ministers] by employment laws that would interfere with the church's internal management, including antidiscrimination laws." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1040 (7th Cir. 2006), *abrogated in part on other grounds by Hosanna–Tabor*, 565 U.S. at 195 n.4.

The ministerial exception is an application of the church autonomy doctrine, which "prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir. 2002) (citing *Kedroff*, 344 U.S. at 116–17). The exception "continues a long-standing tradition that churches are to be free from

government interference in matters of church governance and administration." *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000). The "Constitution forbids us" from treading into "the internal management of a church." *Combs v. Cent. Texas Annual Conference of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999).

When assessing "employment discrimination claims by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal." *Tomic*, 442 F.3d at 1039 (quoting *Combs*, 173 F.3d at 350). Hence, the ministerial exception should bar Demkovich's claims notwithstanding whether the Church asserts a religious justification for the alleged conduct. The ministerial exception "precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision." *Alicea–Hernandez*, 320 F.3d at 703 (quoting *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000)).

### A. Free Exercise Clause

The application of employment discrimination laws "to the employment relationship existing between" the Church and Demkovich will "result in an encroachment by the state into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment." *Alicea-Hernandez*, 320 F.3d at 702–03 (quoting *McClure*, 460 F.2d at 560). The ministerial exception protects the Church's right to the free exercise of religion by "ensur[ing] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the

church's alone." *Hosanna–Tabor*, 565 U.S. at 194–95 (quoting *Kedroff*, 344 U.S. at 119). The Church's "control over [its ministers] is an essential component of its freedom to speak in its own voice, both to its own members and to the outside world." *Hosanna–Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring). Control of a minister necessarily includes the ability to supervise, manage, discipline, and communicate with the minister, including by telling the minister that his behavior does not conform with church doctrine and by instructing him to change his behavior. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060 (stating that religious employers have authority to "supervise" ministers free from government interference).

According to the majority, a religious employer presumably "is interested in maximizing the employee's ability to perform his or her stated duties to further the organization's objectives, not in permitting a supervisor to 'control' the employee through abuse that actively inhibits job performance and is beyond the scope of that supervisor's own employment." But courts are not equipped to say whether a religious employer's communications with its ministers inhibit or improve their job performance, and it is not for courts to regulate how a church communicates with its ministers to further its religious objectives. *Cf. Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").

"[Q]uestions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern."

*Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 717 (1976). Courts "have no say over matters of religious governance." *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013). Attempting "to regulate the relationship between" the Church and Demkovich will "infringe upon the church's right to be the sole governing body of its ecclesiastical rules and religious doctrine." *Gellington*, 203 F.3d at 1304.

Beyond infringing on the Church's free exercise rights in this case, allowing ministers to bring hostile work environment claims will "gravely infringe" on the rights of religious employers more generally "to select, manage, and discipline their clergy free from government control and scrutiny" by encouraging them to employ ministers that lessen their exposure to liability rather than those that best "further [their] religious objective[s]." *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 803–04 (9th Cir. 2005) (Kleinfeld, J., dissenting from denial of rehearing en banc); *see also Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("There is the danger that churches, wary of [Equal Employment Opportunity Commission] or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members."). Allowing Demkovich's employment discrimination claims to go forward will therefore not only violate the Church's free exercise rights, but it threatens the free exercise rights of other religious employers, as well.

### B. Establishment Clause

Applying employment discrimination statutes "to the employment relationship between" the Church and Demkovich

will also "involve 'excessive government entanglement with religion' as prohibited by the Establishment Clause of the First Amendment." *Gellington*, 203 F.3d at 1304 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971)). The majority opinion essentially erases the distinction between ministers and non-ministers as to hostile work environment claims. My colleagues argue that "[p]rocedural entanglement is not necessarily any more a concern with hostile environment claims by ministerial employees than with claims by non-ministerial employees." Additionally, they contend that the conduct alleged here "constituted abuse under neutral, generally applicable standards that would be enforceable on behalf of a non-ministerial employee." But unlike the relationship between a non-minister and a church, the

> relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.

*McClure*, 460 F.2d at 558–59. By treating Demkovich's employment relationship with the Church the same as that between a non-minister and a religious employer, the majority opinion "misses the point of the ministerial exception," which is to "ensure[] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Hosanna–Tabor*, 565 U.S. at 194–95 (quoting *Kedroff*, 344 U.S. at 119).

"The types of investigations a court would be required to conduct in deciding" Demkovich's claims "'could only pro-

duce by their coercive effect the very opposite of that separation of church and State contemplated by the First Amendment.'" *Skrzypczak*, 611 F.3d at 1245 (quoting *McClure*, 460 F.2d at 560) (brackets omitted). "[T]he very process of inquiry" into his employment discrimination claims will violate the First Amendment. *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).

In my view, my colleagues do not fully account for the degree of entanglement with religion inherent in adjudicating Demkovich's hostile work environment claims. Indeed, the risk of excessive religious entanglement is arguably even greater when ministers base their employment discrimination claims on intangible rather than tangible employment actions. For intangible employment actions to be actionable under a hostile work environment theory, the harassment must have been "so severe or pervasive as to alter the conditions of employment." *Johnson*, 892 F.3d at 900. Courts analyze hostile work environment claims based "on all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *E.E.O.C. v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (citation and internal quotation marks omitted). An affirmative defense is available by showing that "the employer exercised reasonable care to prevent and correct" the harassment and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (same).

Consequently, to assess Demkovich's employment discrimination claims, the district court will need to determine whether his religious work environment was appropriate. Its inquiry will necessarily delve into Demkovich's terms and conditions of employment and matters of the Church's governance and administration, including its employment relationship with Demkovich, its control over Demkovich, and Demkovich's workplace conditions. The court will have to decide questions including: whether the alleged harassment was so severe or pervasive as to alter Demkovich's conditions of ministerial employment; whether the Church took reasonable action to prevent or correct the alleged harassment; what the Church's preventive or corrective processes were; and whether Demkovich unreasonably declined to avail himself of any of those preventive or corrective processes. To investigate and evaluate the merits of the claims and the potential affirmative defense,

> *every step* the Church took to respond and react to [Demkovich's] claims will be reviewed by the district court to determine whether it was reasonable. Such an inquiry into whether the Church exercised "reasonable care" will involve, by necessity, penetrating discovery and microscopic examination by litigation of the Church's disciplinary procedures and subsequent responsive decisions.

*Elvig*, 375 F.3d at 973 (Trott, J., dissenting). Allowing Demkovich's employment discrimination claims to overcome the ministerial exception will "involve gross substantive and procedural entanglement with the Church's core functions, its

polity, and its autonomy," which is "precisely what the ministerial exception was designed to cover and to prevent." *Id.* at 976.

### III. Other Causes of Action

Holding that Demkovich's employment discrimination claims must be dismissed would not give religious employers the license to commit the "highly disturbing" acts that my colleagues imply it would. There are remedies for such acts, but federal employment law does not afford them. The ministerial exception does not confer general immunity from a minister's tort claims or from criminal laws. *See, e.g.*, *Tomic*, 442 F.3d at 1040 ("A church could not subject its clergy to corporal punishment or require them to commit criminal acts."). But describing hostile work environment claims in general as "essentially tortious in nature" should not transform statutory Title VII or ADA hostile work environment claims into torts. *See Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 852 (7th Cir. 2019) (recognizing that hostile work environment claims are based on Title VII and the ADA).

There is no suggestion that the conduct at issue here—offensive and derogatory comments—gave rise to any claim other than the employment discrimination claims arising directly out of the protected ministerial employment relationship. Torts are conceptually distinct because liability for a tort generally does not accrue directly from a ministerial relationship. Demkovich's employment discrimination claims, on the other hand, unavoidably involve religious matters at the core of that relationship.

### IV. Conclusion

In *Alicea–Hernandez*, we laid out a workable approach that remains faithful to the religion clauses of the First Amendment: The ministerial exception bars employment discrimination claims brought by ministers "without regard to the type of claims being brought." 320 F.3d at 703. I would follow that approach here by holding that the ministerial exception bars each of Demkovich's employment discrimination claims.

With respect, I dissent.